PEOPLE v UNGER

Docket No. 272591. Submitted March 11, 2008, at Lansing. Decided
March 20, 2008, at 9:00 a.m. Leave to appeal sought.

Mark S. Unger was convicted by a jury in the Benzie Circuit Court,
James M. Batzer, J., of first-degree premeditated murder. He
appealed, alleging numerous errors.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion by conducting a
supplemental evidentiary hearing regarding the admissibility of
the testimony of a prosecution witness, a county medical examiner,
and by admitting the testimony. The district court had erred by
concluding that the witness was not qualified. The trial court
properly determined that the testimony was based on established
standards and methods in the fields of neuropathology and foren-
sic pathology and that the witness applied the methods reliability
to the facts presented.

2. The trial court did not abuse its discretion by allowing the
prosecution to amend the information to reinstate the charge of
first-degree premeditated murder after the court determined that
the county medical examiner, whose testimony was erroneously
ruled to be inadmissible by the district court, could provide
admissible evidence of premeditation and deliberation.

3. There was sufficient evidence to support the jury's conclu-
sion that the defendant intentionally killed the victim, his wife,
and that the defendant premeditated and deliberated the killing.

4. The jury's verdict was not against the great weight of the
evidence. The trial court did not abuse its discretion in denying the
defendant's motion for a new trial on this ground.

5. The defendant waived review of the issue whether the trial
court denied the defendant due process by failing to give individual
limiting instructions concerning the testimony of seven different
witnesses when he affirmatively approved the court's decision to
instruct the jury only once concerning the testimony of all seven
witnesses.

6. Although some of the statements by the prosecutor in
closing argument were improper, any resulting prejudice could

have been cured had the defendant made a timely request for an instruction and any error did not affect the outcome of the trial.

7. The prosecution's factually erroneous argument regarding the testimony of a witness was isolated, brief, and did not affect the outcome of the trial.

8. Although some of the prosecutor's remarks impermissibly impugned the integrity of a defense witness, the trial court properly instructed the jury that the attorneys' statements and arguments were not evidence and the jury should only accept the things said by the attorneys that were supported by the evidence and the common sense and general knowledge of the jurors. A timely objection and a curative instruction would have been sufficient to alleviate any prejudicial effect. No error requiring reversal occurred in this regard.

9. The prosecution's statement that "[b]odies don't bounce," in referring to how the victim's body reached the lake where it was found, was supported by the evidence. If the comment was improper, any prejudicial effect could have been cured by a timely objection and a curative instruction.

10. The defendant failed to overcome the strong presumption that his trial counsel rendered effective assistance. The result of the trial would not have been different but for counsel's alleged errors.

11. There was sufficient probable cause to support the issuance of a search warrant. The statement in the warrant identifying the items to be seized as "[a]ny evidence of homicide" was sufficiently particular to pass constitutional muster.

12. The trial court did not err by excluding from evidence certain computer animations offered by a defense witness that were based on conjecture and were inconsistent with the facts in evidence. The exclusion of such irrelevant evidence did not deny the defendant the constitutional right to present a defense.

13. The trial court did not abuse its discretion by allowing a forensic pathologist to testify as an expert concerning both the cause and the manner of the decedent's death.

14. The defendant's trial counsel was not ineffective in failing to file a motion to change venue that would have had no merit.

15. The trial court erred by conducting a jury view of the scene of the offense before any relevant evidence had been presented. However, the defendant failed to establish prejudice from the error or from defense counsel's failure to object. Defense counsel's failure to object did not constitute ineffective assistance of counsel.

16. The autopsy photographs were relevant evidence that was not unduly prejudicial to the defendant. Defense counsel was not ineffective in failing to make a futile objection to the admission of the photographs.

17. Defense counsel was not ineffective for failing to challenge an allegedly biased potential juror. The trial court did not abuse its discretion in allowing the same juror to continue as a juror after the juror sent a note to the court regarding his doubts about certain testimony and after the court questioned the juror and determined that he would enter into deliberations with an open mind and not attempt to improperly influence his fellow jurors.

18. No plain error occurred when the trial court allowed the office of the Attorney General to intervene in this case.

19. The prosecution and its expert witnesses did not conspire to withhold potentially exculpatory evidence.

20. The defendant was not denied a fair trial by virtue of the cumulative effect of the errors in this case, which were minor and did not seriously prejudice the defendant.

Affirmed.

1. WITNESSES — FORENSIC PATHOLOGISTS — MEDICAL EXAMINERS.

A forensic pathologist who is otherwise qualified may testify as an expert concerning both the cause and the manner of a decedent's death; it is within the field of expertise of a county medical examiner or deputy county medical examiner to offer such testimony (MCL 52.202[1]; MCL 52.205[3]).

2. TRIAL — JURY VIEW.

A trial court generally should not conduct a jury view until the evidence relevant to the view has been admitted at trial (MCL 6.414[F]; MCL 768.28).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Mark G. Sands*, Assistant Attorney General, for the people.

*Matthew Posner* and Mark S. Unger *in propria persona*.

Before: WHITBECK, P.J., and JANSEN and DAVIS, JJ.

JANSEN, J. Defendant appeals as of right his jury-trial conviction of first-degree premeditated murder, MCL 750.316(1)(a), for which he was sentenced to life in prison without parole. We affirm.

I

Defendant was the husband of Florence Unger (also referred to as the victim). Defendant entered residential rehabilitation in late 2002 for alleged prescription drug and gambling addictions. After completing rehabilitation, however, defendant did not return to work. Florence Unger filed for divorce in August 2003.

Notwithstanding the pending divorce proceedings, defendant traveled to the Watervale resort area on Lower Herring Lake with his wife and two children on October 24, 2003. The family arrived sometime in the afternoon and settled into the cottage that they had rented for the weekend. Not far from the cottage was a boathouse. On the roof of the boathouse was a wooden deck, where vacationers at Watervale often congregated. However, there were no other vacationers staying at Watervale on October 24, 2003.

Defendant was on the deck with the victim on the evening of October 24, 2003. Defendant told the police and several family friends that sometime after dark, the victim had asked him to go back to the cottage and check on the two children. Defendant explained that he walked back to the cottage, put the children to bed, and returned to the deck. Defendant told the police and several friends that the victim was not on the deck when he returned, but that he presumed that she had gone to speak with one of the neighbors. Defendant maintained that he then returned to the cottage and fell

asleep watching a movie.[1]

The following morning, defendant called neighbors Linn and Maggie Duncan. Defendant informed the Duncans that Florence had never returned to the cottage on the previous night. The Duncans got dressed and went outside to help defendant search for his wife. Linn and Maggie Duncan went toward the boathouse and discovered Florence Unger dead in the shallow water of Lower Herring Lake. It appeared that she had fallen from the boathouse deck. After finding the body, Linn Duncan came up from the boathouse and walked toward the cottages. Duncan met up with defendant in front of the cottages. According to Duncan, "I touched [defendant] on the chest" and said, "Mark, you're not going to like it. She is in the water." Duncan testified that defendant then "went ballistic," started "crying and screaming and hollering," and "went diagonally down to the water and jumped right in, right next to [the victim's body]." Duncan testified that it was not possible to see the victim's body from the location where he had met defendant because the view of the lake was blocked by bushes and trees. Duncan also testified that he had not given defendant any information whatsoever about the precise location of the victim's body.

Maggie Duncan called 911 and the police arrived at the scene. About 12 feet below the surface of the rooftop deck, an area of concrete pavement extends from the boathouse wall to the edge of Lower Herring Lake. The police observed a large bloodstain on the concrete pavement. Also found on the concrete pavement were one of the victim's earrings, one or two candles, a broken glass candleholder, and a blue blanket. There

---

[1] At trial, the victim's hairdresser recounted a somewhat different version of events.

was no trail of blood between the bloodstain on the concrete and the edge of the lake. The railing surrounding the rooftop deck was noticeably damaged and was bowed out toward the lake.

Upon arriving at the cottage, the police noticed that defendant had already packed his vehicle and seemed eager to leave Watervale with his two sons. The police obtained a warrant to search the vehicle and the interior of the cottage. Among other things, the police recovered a pair of men's shoes from the vehicle. On one of the shoes was a white paint smear. The white paint was tested and was found to be chemically consistent with the white paint on the railing of the boathouse deck.

Defendant was arrested and charged with first-degree premeditated murder. At the preliminary examination, Dr. Stephen D. Cohle[2] testified that the victim had died of traumatic brain injuries sustained upon impact with the concrete pavement. In contrast, Dr. Ljubisa J. Dragovic[3] opined that the victim had not died from head injuries sustained upon impact with the concrete, but had drowned after being dragged or moved into Lower Herring Lake. The district court excluded Dr. Dragovic's opinion testimony and determined that there was no admissible evidence of premeditation. Defendant was therefore bound over for trial on a charge of second-degree murder.

Unlike the district court, the circuit court ruled that Dr. Dragovic's expert testimony was admissible. Accordingly, the circuit court allowed the prosecution to

---

[2] Dr. Stephen D. Cohle, a forensic pathologist, was retained by the office of the Benzie County medical examiner to perform the autopsy in this case.

[3] Dr. Ljubisa J. Dragovic, the Oakland County medical examiner, was a witness for the prosecution.

amend the information and to reinstate the charge of first-degree premeditated murder. The case proceeded to trial. The prosecution argued that defendant had kicked or pushed the victim over the railing, and had then moved the victim from the concrete pavement into the lake in an effort to drown her. The prosecution relied heavily on the testimony of Dr. Dragovic and other expert witnesses. In response, the defense maintained that the victim's death had been accidental and that the victim had died of traumatic brain injuries nearly immediately upon striking the concrete. The defense presented expert testimony to support its theory that the victim had accidentally fallen over the railing and had rolled, bounced, or otherwise inadvertently moved into the lake. After an extensive trial, the jury convicted defendant of first-degree premeditated murder. He was sentenced to life in prison without parole.

II

Defendant first argues that the circuit court erred by conducting a supplemental evidentiary hearing regarding the admissibility of Dr. Dragovic's expert testimony and by ruling that Dr. Dragovic's testimony was admissible pursuant to MRE 702. We disagree.

Defendant preserved these issues by objecting to the circuit court's supplemental evidentiary hearing and by filing a proper motion to exclude Dr. Dragovic's testimony from trial. Preserved evidentiary rulings are reviewed for an abuse of discretion. *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002). "[T]he determination regarding the qualification of an expert and the admissibility of expert testimony is within the trial court's discretion." *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999). Similarly, a trial court's

decision whether to hold an evidentiary hearing is reviewed for an abuse of discretion. See *People v Mischley*, 164 Mich App 478, 481-482; 417 NW2d 537 (1987). An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

Under Michigan evidentiary law, which incorporates the requirements of the United States Supreme Court's decision in *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993),[4] the proponent of expert testimony must establish that the testimony is reliable by showing that it "is based on sufficient facts or data," that it "is the product of reliable principles and methods," and that the proposed expert witness "has applied the principles and methods reliably to the facts of the case." MRE 702. Pursuant to *Daubert* and MRE 702, "the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007) (opinion by DAVIS, J.). Instead, the proper role of the trial court is

> to filter out expert evidence that is unreliable, not to admit only evidence that is unassailable. The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation. [*Id.* at 139.]

See also *Nelson v American Sterilizer Co (On Remand)*, 223 Mich App 485, 491-492; 566 NW2d 671 (1997). The standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of

---

[4] See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780 n 46; 685 NW2d 391 (2004).

the expert's particular proposed testimony. *Daubert*, *supra* at 589-590. An expert's opinion is admissible if it is based on the "methods and procedures of science" rather than "subjective belief or unsupported speculation." *Id.* at 590.

As defendant correctly observes in his brief on appeal, the district court conducted an evidentiary hearing pursuant to *Daubert* at the time of the preliminary examination and concluded that Dr. Dragovic's testimony concerning the cause of Florence Unger's death was not admissible. However, the circuit court—and not the district court—was the trial court in this case. Therefore, it was within the circuit court's discretion to hold a new or supplemental *Daubert* hearing, see *Mischley*, *supra* at 481-482, and to make a renewed determination concerning Dr. Dragovic's qualifications and the admissibility of his expert opinions, *Murray*, *supra* at 52-53.

At the preliminary examination, the district court reserved ruling on the admissibility of Dr. Dragovic's opinions until after Dr. Dragovic's expert testimony had been given in full. Although Dr. Dragovic was at times a cagey and evasive witness at the preliminary examination, his testimony was clearly based on reliable and established methods in the fields of neuropathology and forensic pathology. MRE 702; *Daubert*, *supra* at 589-590. It is true that an examining magistrate must rule on the qualifications of an expert witness before allowing the expert to testify at the preliminary examination. *People v Yost*, 468 Mich 122, 128; 659 NW2d 604 (2003). However, in this case the district court erred by concluding that Dr. Dragovic was not qualified to testify under MRE 702. MRE 702; *Daubert*, *supra* at 589-590. Therefore, the district court erroneously excluded Dr. Dragovic's testimony and opinions from consideration

during the bindover process. See *Yost, supra* at 132-134. In light of the district court's incorrect conclusion regarding the admissibility of Dr. Dragovic's expert testimony, we cannot conclude that the circuit court abused its discretion by holding a new or supplemental evidentiary hearing on the admissibility of Dr. Dragovic's expert opinions concerning the cause of Florence Unger's death.

Nor did the circuit court err by admitting Dr. Dragovic's expert testimony at trial. Even a cursory review of the Michigan Appeals Reports reveals that Dr. Dragovic has been qualified as an expert witness in the fields of neuropathology and forensic pathology many times in the courts of this state. Moreover, the evidence presented at the *Daubert* hearing in circuit court made it clear that Dr. Dragovic's testimony was based on established methods in the fields of neuropathology and forensic pathology and that Dr. Dragovic had applied these methods reliably to the facts of the present case. MRE 702; *Daubert, supra* at 589-590. Although Dr. Dragovic did not perform the autopsy in this case, he testified that he frequently consults and offers expert opinions with respect to cases in which he has not personally autopsied the victim. Dr. Dragovic based his opinions in the present case on the autopsy protocol, the autopsy photographs, various microscope slides, and numerous anatomical specimens that were sent for his examination. On the basis of all this evidence and his expertise as a board-certified neuropathologist and forensic pathologist, Dr. Dragovic concluded that the victim's head injuries could not have caused sufficient brain swelling to result in neurogenic pulmonary edema, and that the victim therefore must have died as a result of the intervening mechanism of drowning.

We note that Dr. Dragovic's inability to specifically identify any medical or scientific literature to support his conclusions in this case does not necessarily imply that his opinions were unreliable, inadmissible, or based on "junk science." Indeed, it is obvious that not every particular factual circumstance can be the subject of peer-reviewed writing. There are necessarily novel cases that raise unique facts and have not been previously discussed in the body of medical texts and journals. Nor was Dr. Dragovic's testimony rendered inadmissible merely because certain experts disagreed with it. We readily acknowledge that there was disagreement among the expert witnesses concerning the victim's cause of death, but as the circuit court correctly observed, "[Defense counsel] can cross-examine [Dr. Dragovic]. . . . They can impeach him." When expert witnesses offer conflicting opinions, it is solely for the jury to determine which expert is more credible. *People v Ross*, 145 Mich App 483, 493; 378 NW2d 517 (1985).

The circuit court properly focused on the scientific validity of Dr. Dragovic's methods rather than on the credibility or soundness of his particular opinions. *Daubert, supra* at 589-590. As the circuit court properly recognized, Dr. Dragovic "didn't use bizarre methods, he didn't use strange methods . . . . He used standard methods of forensic pathology in coming to a conclusion with which defendant disagree[s]." In short, the court concluded that Dr. Dragovic's opinions were based on standard methods in pathology and that the issue of Dr. Dragovic's credibility was for the jury to decide. The circuit court did not abuse its discretion by qualifying Dr. Dragovic as an expert witness or by admitting Dr. Dragovic's expert testimony concerning the cause of Florence Unger's death. *Murray, supra* at 52-53.

III

Defendant also argues that the circuit court erred by allowing the prosecution to amend the information to reinstate the charge of first-degree murder. We disagree.

Defendant timely objected to the prosecution's motion to amend the information. We review a trial court's decision to grant a motion to amend the information for an abuse of discretion. *People v McGee*, 258 Mich App 683, 686-687; 672 NW2d 191 (2003).

A trial court may permit amendment of the information at any time to correct a variance between the information and the proofs, unless doing so would unfairly surprise or prejudice the defendant. MCL 767.76; MCR 6.112(H); *People v Russell*, 266 Mich App 307, 317; 703 NW2d 107 (2005). Once a preliminary examination is held and the defendant is bound over on any charge, the circuit court obtains jurisdiction over the defendant. *People v Goecke*, 457 Mich 442, 458-459; 579 NW2d 868 (1998). "Jurisdiction having vested in the circuit court, the only legal obstacle to amending the information to reinstitute an erroneously dismissed charge is that amendment would unduly prejudice the defendant because of 'unfair surprise, inadequate notice, or insufficient opportunity to defend.' " *Id*. at 462 (citation omitted).

Once Dr. Dragovic was qualified as an expert witness and his proposed testimony was ruled admissible, it became evident that there was admissible evidence of premeditation and deliberation in this case. By allowing an amendment of the information to reinstate the charge of first-degree premeditated murder, the court was merely permitting the prosecution to correct a variance between the information and the proofs. MCL 767.76; MCR 6.112(H). And because defendant had

originally been charged with first-degree premeditated murder, there was necessarily no unfair surprise or prejudice to defendant. "Where a preliminary examination is held on the very charge that the prosecution seeks to have reinstated, the defendant is not unfairly surprised or deprived of adequate notice or a sufficient opportunity to defend at trial . . . ." *Goecke, supra* at 462. The circuit court did not abuse its discretion by allowing the prosecution to amend the information to reinstate the charge of first-degree premeditated murder. *McGee, supra* at 686-687.

IV

Defendant argues that there was insufficient evidence presented at trial to support his conviction of first-degree premeditated murder. We disagree.

Due process requires that the evidence show guilt beyond a reasonable doubt in order to sustain a conviction. *People v Johnson*, 460 Mich 720, 723; 597 NW2d 73 (1999). In reviewing a claim of insufficient evidence, we view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have concluded that the elements of the offense were proven beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515-516; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992); *People v Hoffman*, 225 Mich App 103, 111; 570 NW2d 146 (1997). "It is the jury's task to weigh the evidence and decide which testimony to believe." *People v Jones*, 115 Mich App 543, 553; 321 NW2d 723 (1982). All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses. *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999).

A

In order to convict a defendant of first-degree premeditated murder, the prosecution must first prove that the defendant intentionally killed the victim. *People v Marsack*, 231 Mich App 364, 370; 586 NW2d 234 (1998). We acknowledge that the prosecution's case against defendant was entirely circumstantial and that there was no eyewitness testimony presented at trial. However, circumstantial evidence and reasonable inferences arising therefrom may constitute satisfactory proof of the elements of the offense. *Id.* at 371. It is well settled that the intent to kill may be inferred from any facts in evidence. *Hoffman, supra* at 111. Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill. *McRunels, supra* at 181.

As an initial matter, both Dr. Cohle and Dr. Dragovic concluded that the manner of death in this case was homicide. Both doctors excluded the possibility of accidental death because neither believed that the victim's body could have gotten into the water of Lower Herring Lake absent the purposeful actions of a second person.

There was also substantial evidence to suggest that defendant had a motive to kill the victim. Although motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant. *People v Rice (On Remand)*, 235 Mich App 429, 440; 597 NW2d 843 (1999). In cases in which the proofs are circumstantial, evidence of motive is particularly relevant. *People v Fisher*, 449 Mich 441, 453; 537 NW2d 577 (1995). The victim had filed for divorce. Only days before her death, the victim had served defendant's divorce attorney with interrogatories asking probing questions about defendant's addictions and possible misuse of marital assets. Although the evidence showed

that the victim was committed to ending the marriage, the proofs established that defendant was strongly opposed to the idea of divorce. The proofs also showed that defendant had threatened to take sole custody of the children and to take the marital home in the event that the victim further pursued the divorce. Evidence of marital discord is admissible to establish motive for murder. *Id.* at 453; see also *People v Rotar*, 137 Mich App 540, 548-549; 357 NW2d 885 (1984). There was also evidence of substantial life insurance policies on the victim's life. Evidence of insurance on the life of the deceased is admissible in a prosecution for murder as long as it can be established that the defendant was aware of the insurance policy before the killing took place. See *People v Auerbach*, 176 Mich 23, 40; 141 NW 869 (1913).

Defendant also had the opportunity to kill the victim. Evidence of opportunity is logically relevant in a prosecution for murder. *People v Ortiz*, 249 Mich App 297, 305-306; 642 NW2d 417 (2001). The evidence presented at trial established that defendant and the victim were alone on the boathouse deck on the night of the victim's death. Even defendant, himself, admitted to the police that he was probably the last person to see the victim alive.

There was also evidence that a scuffle or struggle may have taken place on the boathouse deck within a short time before the victim's death. The proofs established that the railing surrounding the boathouse deck had been damaged sometime on the day of the victim's death. Linn Duncan had been on the deck the day before the victim's death, and the railing had not been broken at that time. However, the railing was damaged and broken at the time the victim's body was discovered. It is possible that the damage could have resulted

from the victim's accidentally falling or tripping over the railing. However, taken together with the white paint smear on defendant's shoe, which matched the chemical composition of the paint on the railing, it is equally likely that the damage to the railing was evidence of a struggle on the deck between defendant and the victim. Moreover, there was evidence that the victim sustained internal abdominal injuries before her death. Both Dr. Cohle and Dr. Dragovic testified that the internal abdominal injuries were more likely caused by impact with a blunt, protruding object, such as a fist or a foot, than by the victim's impact with the concrete pavement.

Certain evidence in this case also tended to establish defendant's consciousness of guilt. Defendant made numerous statements to many different friends and acquaintances in the days following the victim's death. Certain of these statements were inconsistent, and could certainly have been interpreted by reasonable jurors as evidence of intentional prevarication. Of note, although the evidence at trial clearly established that Linn Duncan found the blue blanket on the concrete pavement at the time he discovered the victim's body, defendant told at least one person in the days following the victim's death that he had personally retrieved the blanket after Duncan had already found the body in order to "keep [the victim] warm." In addition, defendant told the police and most of his friends that when he returned from putting the children to bed, the victim was no longer on the deck. However, defendant told the victim's hairdresser that upon putting the children to bed, he had returned to the deck and the victim was there. According to the hairdresser, defendant told her that "[Florence] was still there, she was fine, so I just went back up to the house. And she never came home." "[C]onflicting statements tend to show a consciousness

of guilt and are admissible as admissions." *People v Cowell*, 44 Mich App 623, 625; 205 NW2d 600 (1973). Although not necessarily inculpatory when taken by themselves, these conflicting statements, when considered together with the other circumstantial proofs in this case, lend further evidence from which a rational jury could have inferred defendant's guilt.

There was also evidence that defendant had already packed his vehicle and was eager to leave Watervale with his two children when the police arrived. "[E]vidence of flight is admissible to support an inference of 'consciousness of guilt' and the term 'flight' includes such actions as fleeing the scene of the crime." *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003); see also *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995). We acknowledge that defendant did not actually flee the scene. We further acknowledge that it is always for the jury to determine whether evidence of flight occurred under such circumstances as to indicate guilt. See *People v Cutchall*, 200 Mich App 396, 398; 504 NW2d 666 (1993). However, the evidence that defendant was preparing to leave and had already packed his family's belongings into the vehicle when the victim's body had not even been removed from the lake could have allowed reasonable jurors to infer that defendant had a guilty state of mind.

A rational jury could have also inferred defendant's consciousness of guilt from evidence that defendant wished to have the victim's body immediately cremated. Defendant's desire to have the body cremated could be viewed as an effort to destroy evidence of the crime of murder, thereby showing a consciousness of guilt. See *People v Usher*, 121 Mich App 345, 351; 328 NW2d 628 (1982), overruled in part on other grounds *People v Perry*, 460 Mich 55, 64-65 (1999).

Defendant's own statements concerning the events leading up to the victim's death provided additional evidence from which the jury could have inferred a consciousness of guilt. Defendant told the police and several family friends that on the evening of October 24, 2003, he had left the victim alone on the boathouse deck when he went to check on the two children. However, substantial testimony at trial revealed that the victim had a lifelong fear of the dark and that she routinely avoided being alone outdoors at night. It is beyond dispute that it was already dark when defendant left the boathouse deck, and certain evidence suggested that it was also raining at the time. Evidence of habit and routine is generally admissible to prove conformity therewith. MRE 406. Given the victim's lifelong fear of the dark and her routine avoidance of the outdoors at night, a rational jury could have concluded that the victim would not have voluntarily stayed on the boathouse deck alone after dark and that defendant had therefore fabricated his account of the events leading up to the victim's death. A jury may infer consciousness of guilt from evidence of lying or deception. See, e.g., *State v Lee*, 158 Ohio App 3d 129, 132-133; 814 NE2d 112 (2004); *Coggin v State*, 356 Ark 424, 433; 156 SW3d 712 (2004); *State v Lasage*, 523 NW2d 617, 621 (Iowa App, 1994).

We acknowledge that the proofs established an absence of past physical violence between defendant and the victim. However, the mere absence of past violence is necessarily of limited value and relevance.

We also acknowledge that Dr. Carl Schmidt[5] and Dr. Igor Paul[6] both opined that the victim likely fell from the deck accidentally. Indeed, Dr. Paul's computer

---

[5] Dr. Carl Schmidt, the Wayne County chief medical examiner, was a witness for the defense.

[6] Dr. Igor Paul, a professor of biomechanical engineering, was a witness for the defense.

graphics demonstrated to the jury how an accidental fall could have occurred if the victim lost her balance.[7] However, Dr. Paul admitted that he could not rule out the possibility that the victim's fall was caused by the criminal agency of another person. Moreover, the absence of "palms-down" injuries on the victim's body provided evidence from which a rational jury could have concluded that the victim was already unconscious or otherwise incapacitated when she struck the concrete pavement. Although there were some wounds on the victim's hands and arms, Dr. Cohle testified that he did not believe the injuries were sustained as the result of a "palms-down position." In other words, Dr. Cohle did not believe that the hand and arm injuries were consistent with an attempt by the victim to brace herself upon impact with the concrete. Dr. Cohle's testimony in this regard suggested the possibility that the victim's fall from the deck was not accidental. In the end, questions concerning the credibility of Drs. Schmidt and Paul and the weight to be accorded to their testimony were solely for the jury to determine. *Jones, supra* at 553.

The jury is "free to believe or disbelieve, in whole or in part, any of the evidence presented at trial." *People v Eisenberg*, 72 Mich App 106, 115; 249 NW2d 313 (1976). This Court does not weigh the competing evidence; that is the jury's function. *People v Hardiman*, 466 Mich 417, 431; 646 NW2d 158 (2002). We afford deference to the

---

[7] Of course, it is possible that defendant did not intentionally push the victim from the deck, but that the victim nonetheless lost her balance and fell during a scuffle with defendant. Even assuming such facts, however, a rational jury could have still concluded that defendant descended to the concrete pavement after the scuffle and intentionally moved the victim into the lake to prevent her from recovering from her injuries. In other words, even if the jury honestly believed that the victim accidentally or inadvertently fell from the deck, it nevertheless could have logically found beyond a reasonable doubt that defendant killed his wife.

jury's special opportunity to weigh the evidence and assess the credibility of the witnesses. *Wolfe, supra* at 514-515. Taking the evidence as a whole and viewing it in a light most favorable to the prosecution, *id.* at 515, we conclude that there was sufficient evidence to support the jury's conclusion that defendant intentionally killed his wife.

B

To secure a conviction of first-degree premeditated murder, the prosecution must also prove beyond a reasonable doubt "that the killing was premeditated and deliberate." *Marsack, supra* at 370. "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v Anderson,* 209 Mich App 527, 537; 531 NW2d 780 (1995). Premeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide. *Id.* Some time span between the initial homicidal intent and the ultimate killing is necessary to establish premeditation and deliberation. *People v Gonzalez,* 468 Mich 636, 641; 664 NW2d 159 (2003). However, the time required need only be long enough "to allow the defendant to take a second look." *People v Schollaert,* 194 Mich App 158, 170; 486 NW2d 312 (1992). Circumstantial evidence and reasonable inferences drawn from the evidence may constitute satisfactory proof of premeditation and deliberation. *Marsack, supra* at 371.

Both Dr. Cohle and Dr. Dragovic testified that they believed that another person moved the victim's body into the water. Whereas Dr. Dragovic believed that the victim drowned after being moved into the lake, Dr.

Cohle believed that the victim died on the concrete pavement as a result of her head injuries. However, even Dr. Cohle acknowledge that the victim was likely alive for at least some time after striking the concrete, and Dr. Cohle could not rule out the possibility that drowning played a role in the victim's death.

When experts offer conflicting opinions, it is for the jury to decide which testimony to believe. *Ross, supra* at 493. Here, the jury was free to believe Dr. Dragovic's opinion concerning the victim's cause of death and to disbelieve the opinions of Drs. Cohle and Schmidt. *Eisenberg, supra* at 115. The testimony of Dr. Dragovic, if believed, was certainly sufficient to permit a rational jury to conclude that defendant had "sufficient time to . . . take a second look" before moving the victim into the lake. *Schollaert, supra* at 170.

Even if the jury believed the testimony of Drs. Cohle and Dragovic equally, there was still sufficient evidence of deliberation and premeditation. Assuming that defendant did move the victim's body into the lake—an inference clearly supported by both Dr. Cohle's and Dr. Dragovic's testimony—the logical inference arises that defendant was motivated to move the victim precisely because he perceived that she was still alive and wished to prevent her possible recovery. Given the otherwise-unexplained relocation of the victim's body into the lake, a rational jury could have reasonably inferred that defendant moved the victim's body into the water and that the victim was still alive before being moved. This would necessarily have given defendant "sufficient time to . . . take a second look," *id.*, and would have therefore allowed a rational jury to find premeditation and deliberation beyond a reasonable doubt.

Lastly, even assuming arguendo that the jury wholly discredited Dr. Dragovic's testimony and believed that

the victim was already dead before being moved into the lake, the jury still could have found beyond a reasonable doubt that defendant premeditated and deliberated the killing. Evidence showing marital discord is admissible as circumstantial evidence of premeditation and deliberation. *Fisher, supra* at 453. Moreover, as noted earlier, certain evidence suggested that defendant and the victim were engaged in a struggle on the boathouse deck before the time of death. Of particular note, the proofs tended to show that the victim's internal abdominal injuries were more likely caused by a fist or a foot than by impact with the concrete pavement. Additionally, the absence of "palms-down" injuries on the victim's body suggested that the victim might have been knocked unconscious or otherwise incapacitated before she ever struck the concrete pavement. The nature and number of a victim's wounds may support a finding of premeditation and deliberation. See *People v Coy*, 243 Mich App 283, 315-316; 620 NW2d 888 (2000); see also *People v Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998). Specifically, evidence that a victim sustained multiple violent blows may support an inference of premeditation and deliberation. 40A Am Jur 2d, Homicide, § 257, p 99. This is because the time required to inflict multiple blows affords an assailant "sufficient time to . . . take a second look." *Schollaert, supra* at 170. On the basis of the evidence, a rational jury could have concluded that even if the victim died on the concrete pavement, defendant nonetheless premeditated and deliberated the killing.

Viewing the whole body of proofs in a light most favorable to the prosecution, *Wolfe, supra* at 514-515, we conclude that there was sufficient evidence to support the jury's conclusion that defendant premeditated and deliberated the victim's murder.

V

Defendant next argues that the jury's verdict in this case was against the great weight of the evidence. We disagree.

Defendant preserved his argument that the verdict was against the great weight of the evidence by moving for a new trial on this ground. We review for an abuse of discretion a trial court's grant or denial of a new trial on the ground that the verdict was against the great weight of the evidence. *People v McCray*, 245 Mich App 631, 637; 630 NW2d 633 (2001).

A trial court may grant a motion for a new trial based on the great weight of the evidence only if the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998); *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998). Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial. *Lemmon, supra* at 643. Absent exceptional circumstances, issues of witness credibility are for the trier of fact. *Id.* at 642-643. The hurdle that a judge must clear in order to overrule a jury and grant a new trial "is unquestionably among the highest in our law." *People v Plummer*, 229 Mich App 293, 306; 581 NW2d 753 (1998) (quotation marks and citation omitted).

Despite the presence of conflicting testimony in this case, we cannot conclude that the evidence preponderated so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. *Lemmon, supra* at 627. Defendant's conviction of first-degree premeditated murder was not against the great weight of the evidence, and the trial court did not abuse

its discretion by denying defendant's motion for a new trial on this ground. *McCray, supra* at 637.

VI

Defendant argues that he was denied due process when the trial court failed to give individual limiting instructions concerning the testimony of seven different witnesses, all of whom testified that the victim had been upset and concerned about defendant's drug and gambling addictions. We find that defendant waived review of this issue when he affirmatively approved the trial court's decision to instruct the jury only once concerning the testimony of all seven of the witnesses.

After the first of these witnesses testified, defense counsel requested a limiting instruction regarding the use of the testimony. The trial court gave the following instruction to the jury:

> Members of the Jury, you have just heard testimony that Florence Unger was unhappy in her marriage, having marital problems, and she was unhappy with respect to defendant, Mark Unger's purported drug and gambling problems. This testimony is not admissible to establish that Mark Unger was addicted to drugs or gambling, it is admissible only to show Florence Unger's state of mind, and that there was marital discord. You may consider this testimony only for this limited purpose, that is, her unhappiness in her marriage relationship, and intent to divorce Mark Unger.
>
> With respect to [defendant's] purported addictive problems, those are admissible not to establish that he was in fact addicted to drugs or alcohol ... but only that they formed part of the basis in [the victim's] mind for the purported marital discord.
>
> You are to consider this testimony only for this limited purpose and not for any other purpose. Such evidence is not admissible to establish that the defendant, Mark Un-

ger, actually had drug, alcohol or gambling addictions, nor is it admissible as evidence of Mark Unger's character. In other words, this testimony is not admissible to show or establish that the defendant, Mark Unger, is a bad person, or that he has a bad character. You cannot consider this testimony for those purposes.

And we are going to hear from other witnesses with respect to statements that Florence Unger made, and that same instruction will be applicable to their testimony.

We conclude that defendant waived any argument in this regard when defense counsel expressed satisfaction with the trial court's instruction to the jury. *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000). Immediately before the court instructed the jury, the prosecution suggested that the court read the limiting instruction only once "for all of those witnesses, so we don't have to take it witness-by-witness." Defense counsel responded, "That would be fine." By affirmatively approving the trial court's decision to instruct the jury only once concerning the testimony of all seven witnesses, defendant waived review of this issue. *Id.* at 214-215. Any error has therefore been extinguished. *Id.* at 215.

VII

Defendant next argues that the prosecution committed misconduct during closing argument when it denigrated the integrity of defense counsel, asserted that the defense experts had lied, and argued facts that were not in evidence. We agree that some of the challenged prosecutorial statements were improper, but conclude that any resulting prejudice could have been cured by a timely instruction and did not affect the outcome of trial.

"Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured

the error, or a failure to review the issue would result in a miscarriage of justice." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). Because the challenged prosecutorial statements in this case were not preserved by contemporaneous objections and requests for curative instructions, appellate review is for outcome-determinative, plain error. *Id.*; see also *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Callon, supra* at 329. "Further, we cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id.* at 329-330. Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, *People v Humphreys*, 24 Mich App 411, 414; 180 NW2d 328 (1970), and jurors are presumed to follow their instructions, *People v Mette*, 243 Mich App 318, 330-331; 621 NW2d 713 (2000).

A

Defendant contends that the prosecution impermissibly denigrated defense counsel. Defendant specifically challenges several arguments made by the prosecution during closing argument, including: (1) that defense counsel had "re-victimized" Florence Unger during the course of trial, (2) that defense counsel had "bought" Dr. Paul's testimony by paying him a substantial amount of money, (3) that the defense had improperly cross-examined Drs. Cohle and McKeever[8] and had attempted to mislead the jury by way of "tortured questioning" and "deliberately loaded questions," and

---

[8] Dr. Paul McKeever, a professor of neuropathology, was another witness for the prosecution.

(4) that defense counsel had attempted to "mislead" and "fool" the jury by using "red herrings" and "smoke and mirrors."[9]

Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case. *Id.* However, "[a] prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury." *People v Watson*, 245 Mich App 572, 592; 629 NW2d 411 (2001); see also *People v Dalessandro*, 165 Mich App 569, 580; 419 NW2d 609 (1988).

> The prosecutor may not question defense counsel's veracity. When the prosecutor argues that the defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that defense counsel does not believe his own client. This argument undermines the defendant's presumption of innocence. Such an argument impermissibly shifts the focus from the evidence itself to the defense counsel's personality. [*People v Wise*, 134 Mich App 82, 101-102; 351 NW2d 255 (1984) (internal citations omitted).]

The prosecution was free to argue that defense counsel had "bought" Dr. Paul's testimony by paying

---

[9] Defendant also takes issue with the prosecution's argument that defense counsel had painted Florence Unger as a "shopping-crazed adulteress." After reviewing the entire record, we must agree that this comment by the prosecution was improper. Defense counsel never argued that the victim was a "shopping-crazed adulteress," and precious little testimony was ever elicited by the defense with respect to the victim's infidelity or shopping habits. Indeed, it was the prosecution's own witness who first established the fact and extent of the victim's extramarital affair. However, this improper line of prosecutorial argument simply did not deny defendant a fair trial or constitute outcome-determinative, plain error.

him a substantial amount of money. This statement did not denigrate defense counsel as much as it tended to denigrate the expert witness himself. Moreover, counsel is always free to argue from the evidence presented at trial that an expert witness had a financial motive to testify. See *People v Williams*, 162 Mich App 542, 548-549; 414 NW2d 139 (1987). The record supports the prosecution's argument that Paul was substantially compensated for his testimony, and we therefore find no error in this regard. *Id*.

In contrast, the prosecution exceeded the bounds of proper argument when it suggested that defense counsel had "re-victimized" Florence Unger during the course of trial. A prosecutor may not appeal to the jury to sympathize with the victim. *Watson, supra* at 591; *Wise, supra* at 104. Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices. *Bahoda, supra* at 282. The prosecution's comments regarding "re-victimiz[ation]" of the victim were improper. However, viewed in context, the comments were relatively brief and did not likely deflect the jury's attention from the evidence presented in this case. Moreover, at the conclusion of trial, the court instructed the jury that "[t]he attorneys' statements and arguments are not evidence" and that "[y]ou should only accept things the attorneys say that are supported by the evidence or by your own common sense and general knowledge." As noted earlier, jurors are presumed to follow their instructions. *Mette, supra* at 330-331. Finally, because a timely objection and curative instruction could have alleviated any prejudicial effect of the improper prosecutorial statement, we cannot conclude that the error denied defendant a fair trial or that it affected the outcome of the proceedings. *Callon, supra* at 329.

The prosecution also clearly exceeded the bounds of proper argument when it suggested (1) that defense counsel had attempted to "confuse the issue[s]" and "fool the jury" by way of "tortured questioning," "deliberately loaded questions," and "a deliberate attempt to mislead," (2) that defense counsel had attempted to "confuse" and "mislead" the jury by using "red herrings" and "smoke and mirrors," and (3) that defense counsel had attempted "to deter [the jury] from seeing what the real issues are in this case." We acknowledge that the prosecution's remarks must be considered in light of defense counsel's comments and that " '[a]n otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument.' " *Watson, supra* at 593, quoting *People v Kennebrew*, 220 Mich App 601, 608; 560 NW2d 354 (1996). However, unlike the challenged prosecutorial statements at issue in *Watson*, the challenged prosecutorial statements in this case were not made during the prosecution's rebuttal. Instead, they were made during the prosecution's initial closing statement and were not in direct response to defense counsel's argument. The prosecution's statements in this regard certainly suggested that defense counsel was trying to distract the jury from the truth, and they were therefore improper. *Dalessandro, supra* at 580.

However, as noted earlier, the trial court instructed the jury that "[t]he attorneys' statements and arguments are not evidence" and that "[y]ou should only accept things the attorneys say that are supported by the evidence or by your own common sense and general knowledge." Further, because a timely objection and curative instruction could have alleviated any prejudicial effect the improper prosecutorial comments may have had, we can find no error requiring reversal. *Callon, supra* at 329.

B

Defendant also contends that the prosecution mis-characterized the testimony of Dr. Cohle by arguing that Dr. Cohle had never testified that he was only 51 percent certain that the victim's death was a homicide. A review of the record reveals that the prosecution argued, "The words of Dr. Cohle never were '51 percent.' " The prosecution's argument in this regard was clearly wrong. Indeed, Dr. Cohle did testify that he was "51 [percent], or thereabouts" certain that the victim's death was a homicide. Nonetheless, this factually erroneous argument by the prosecution does not warrant reversal. The inaccurate prosecutorial remark was isolated, brief, and did not affect the outcome of defendant's trial.

C

Defendant next contends that the prosecution impermissibly denigrated defense experts Drs. Paul and Schmidt. First, defendant contends that the prosecution impermissibly argued that the defense experts were not credible because they were "high priced defense experts," because they were "being paid for [their] testimony," and because "these experts . . . were paid all this money." Defendant also challenges the prosecution's argument that "[f]or $25,000, you get Igor Paul and his cartoons." As noted previously, however, the prosecution is free to argue from the evidence presented that an expert witness had a financial motive to testify at trial. See *Williams, supra* at 548-549. Moreover, the prosecution is not required to state inferences and conclusions in the blandest possible terms. *People v Launsburry*, 217 Mich App 358, 361; 551 NW2d 460 (1996). The record supports the prosecution's argument

that both Dr. Paul and Dr. Cohle were paid to testify for the defense in this matter, and we therefore perceive no error.

We are more troubled by the prosecution's arguments that Dr. Paul was hired by the defense "to come in with [his] credentials and fool this jury," that Dr. Paul was hired to provide "[r]easonable doubt at reasonable prices," and that "[Dr. Paul] did what he was paid to do." Arguing that an expert witness had a financial motive to testify is one thing; arguing that the expert has intentionally misled the jury is quite another. A prosecutor may argue from the facts that a witness is credible or that a witness is not worthy of belief. *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997). We fully acknowledge that prosecutorial arguments regarding credibility are not improper when based on the evidence, even if couched in terms of belief or disbelief. *People v Jansson*, 116 Mich App 674, 693-694; 323 NW2d 508 (1982). However, in a case that turns largely on conflicting expert testimony, a prosecutor must take special steps to avoid misconduct designed to impugn the integrity of the defendant's experts. *People v Tyson*, 423 Mich 357, 376; 377 NW2d 738 (1985). When the expert testimony is relevant to a substantial, disputed issue in the case, and each expert's testimony is otherwise competent, resolution of the conflict between the experts must be left solely to the finder of fact. See *Yost, supra* at 132 n 11. We find that the challenged prosecutorial remarks unnecessarily and impermissibly impugned the integrity of Dr. Paul and that the prosecution committed misconduct in this respect.

Again, however, the trial court instructed the jury that "[t]he attorneys' statements and arguments are not evidence" and that "[y]ou should only accept things

the attorneys say that are supported by the evidence or by your own common sense and general knowledge." Furthermore, a timely objection and curative instruction would have been sufficient to alleviate any prejudicial effect of these inappropriate prosecutorial arguments. *Callon, supra* at 329. We find no error requiring reversal in this regard.

D

Defendant lastly contends that the prosecution argued facts not in evidence when it stated during rebuttal that "[b]odies don't bounce." A prosecutor may not make a statement of fact to the jury that is not supported by evidence presented at trial and may not argue the effect of testimony that was not entered into evidence. *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). Dr. Paul testified that, under certain conditions such as a fall from 12 feet onto a concrete surface, bodies do bounce. However, Drs. Cohle and Dragovic testified that they did not believe the victim's body could have bounced, rolled, or otherwise moved into the lake on its own volition. Accordingly, we cannot conclude that the prosecution argued facts not in evidence. Moreover, even if this comment had been improper, any prejudicial effect could have been dispelled by a timely objection and curative instruction. *Id*. at 687.

VIII

Defendant argues that he was denied the effective assistance of trial counsel when his attorneys failed to object to the abovementioned, alleged prosecutorial improprieties. Defendant also argues that he was denied the effective assistance of counsel when his attor-

neys failed to object to the testimony of several witnesses concerning his alleged drug and gambling addictions. We disagree.

Defendant preserved his claim of ineffective assistance of trial counsel by moving for a new trial on this ground. *People v Snider*, 239 Mich App 393, 423; 608 NW2d 502 (2000). A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review factual findings for clear error, but we review de novo questions of constitutional law. *Id.*

"To establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that there is a reasonable probability that, but for the deficiency, the factfinder would not have convicted the defendant." *Snider, supra* at 423-424; see also *People v Pickens*, 446 Mich 298, 309; 521 NW2d 797 (1994). Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases. See *id.* at 325. There is accordingly a strong presumption of effective assistance of counsel. *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004).

We cannot omit mention of the fact that defendant was represented by capable defense counsel throughout the proceedings below. As an experienced attorney, lead defense counsel was certainly aware that "there are times when it is better not to object and draw attention to an improper comment." *Bahoda, supra* at 287 n 54. Furthermore, declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy. See *Matuszak, supra* at 58. We will not substitute our judgment for that of counsel on

matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence. *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). Defendant has simply failed to overcome the strong presumption that trial counsel's performance was strategic. *Matuszak, supra* at 58-59. Nor can we conclude that, but for counsel's alleged errors, the result of defendant's trial would have been different. *Id.* We find no ineffective assistance of counsel in this regard.

IX

Defendant next argues that his Fourth Amendment rights were violated when the police seized his shoes from the family vehicle. He asserts that the affidavit supporting the issuance of the search warrant did not establish probable cause and that the warrant did not describe with particularity the items to be seized. Defendant is entitled to no relief on these issues.

Defendant preserved these issues by moving to suppress the evidence that was seized from his automobile on the ground that the search warrant was deficient. A trial court's ruling on a motion to suppress evidence is reviewed for clear error, but its conclusions of law are reviewed de novo. *People v Sobczak-Obetts*, 463 Mich 687, 694; 625 NW2d 764 (2001). " 'A magistrate's "determination of probable cause should be paid great deference by reviewing courts." ' " *People v Russo*, 439 Mich 584, 604; 487 NW2d 698 (1992), quoting *Illinois v Gates*, 462 US 213, 236; 103 S Ct 2317; 76 L Ed 2d 527 (1983), in turn quoting *Spinelli v United States*, 393 US 410, 419; 89 S Ct 584; 21 L Ed 2d 637 (1969). Appellate review of a magistrate's determination whether probable cause exists to support a search warrant "involves neither de novo review nor application of an abuse of discretion standard. Rather, the preference for war-

rants . . . requires the reviewing court to ask only whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *Russo, supra* at 603.

A

Defendant first contends that there was no probable cause to support the magistrate's issuance of the search warrant in this case. We have carefully reviewed the affidavit underlying the search warrant, which was executed by affiant detective Kenneth Fallowfield. In the affidavit, Fallowfield averred that he responded to Watervale on the morning following the victim's death, that he and other officers had concluded that the victim's death was "suspicious," that he had been advised of marital discord between defendant and the victim, that defendant had informed him that he was alone with the victim on the boathouse deck on the evening of October 24, 2003, and that "[b]ased on affiant's training and experience, affiant believes there exists evidence of a homicide [in the cottage or the automobile]."

A search warrant may only be issued upon a showing of probable cause. US Const, Am IV; Const 1963, art 1, § 11; MCL 780.651(1). Probable cause to issue a search warrant exists if there is a substantial basis for inferring a fair probability that contraband or evidence of a crime exists in the stated place. *People v Kazmierczak,* 461 Mich 411, 417-418; 605 NW2d 667 (2000). The affidavit underlying the warrant must be read "in a common-sense and realistic manner." *Russo, supra* at 604.

Reading the affidavit in a commonsensical and realistic manner, and deferring to the decision of the magistrate as we must, we conclude that "a reasonably

cautious person could have concluded that there was a 'substantial basis' for [a] finding of probable cause" that evidence of a homicide existed in the cottage and defendant's automobile. *Id.* at 603. Although the affidavit was not greatly detailed, there was sufficient probable cause to support the search warrant at issue in this case. MCL 780.651(1).

B

Defendant also contends that even if there was probable cause to support the issuance of the search warrant, the warrant did not state with adequate particularity the items to be seized. A search warrant must particularly describe the place to be searched and the persons or things to be seized. US Const, Am IV; Const 1963, art 1, § 11; MCL 780.654(1). The amount of specificity required will vary with the circumstances and the types of items involved. *People v Martin*, 271 Mich App 280, 304; 721 NW2d 815 (2006). "The purpose of the particularity requirement in the description of items to be seized 'is to provide reasonable guidance to the executing officers and to prevent their exercise of undirected discretion in determining what is subject to seizure.' " *Id.*, quoting *People v Fetterley*, 229 Mich App 511, 543; 583 NW2d 199 (1998).

It is true that the search warrant at issue in this case contained broad language, professing to authorize the seizure of "[a]ny evidence of homicide." However, we cannot conclude that the warrant was so general in its language or so lacking in particularity as to be deficient. The warrant did not authorize the seizure of *all* items, but, rather, only permitted the seizure of items that might reasonably be considered "evidence of homicide." In other words, the warrant was "sufficiently particular to pass constitutional muster since the executing officers' discre-

tion in determining what was subject to seizure was limited to items related to [homicide]." *People v Zuccarini*, 172 Mich App 11, 16; 431 NW2d 446 (1988); see also *Martin, supra* at 305. A general description, such as "evidence of homicide," is not overly broad if probable cause exists to allow such breadth. See *Zuccarini, supra* at 16.

The warrant issued in this case was based on probable cause and adequately limited the executing officers to searching for "evidence of homicide" only. The trial court did not err by declining to suppress the evidence seized from defendant's vehicle pursuant to the valid search warrant. *Sobczak-Obetts, supra* at 694.[10]

X

Defendant argues that the trial court erred by excluding certain of Dr. Paul's computer animations from evidence at trial and that the court denied him the constitutional right to present a defense by doing so. We disagree.

---

[10] Even assuming arguendo that the search warrant was deficient in some manner, we note that the evidence seized from defendant's automobile would still have been admissible. If a search warrant is not valid because it was technically defective, any evidence seized pursuant to that warrant is typically inadmissible pursuant to the exclusionary rule. *People v Hellstrom*, 264 Mich App 187, 193; 690 NW2d 293 (2004). However, Michigan courts recognize certain exceptions to this general principle. For instance, Michigan courts recognize a "good-faith exception" to the exclusionary rule. *Id.* at 193-194. When police officers act in objective good faith in executing a search warrant, the items seized are admissible even if the warrant is later declared invalid. *People v Goldston*, 470 Mich 523, 526; 682 NW2d 479 (2004). There is simply no evidence that the police did not act in objective good faith when executing the warrant at issue in this case. Michigan courts also recognize an "automobile or motor vehicle exception," which allows the police to "search a motor vehicle without the necessity of first obtaining a warrant if probable cause to support the search exists." *Kazmierczak, supra* at 418-419. This exception would also apply in the present case because at the time defendant's shoes were seized from the vehicle, there was probable cause to believe that evidence might be contained in defendant's automobile.

This issue was raised before and decided by the trial court. Preserved evidentiary rulings are reviewed for an abuse of discretion. *Hine, supra* at 250. However, we review de novo the question whether a defendant was denied the constitutional right to present a defense. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002).

A

In Michigan, "[d]emonstrative evidence is admissible when it aids the fact-finder in reaching a conclusion on a matter that is material to the case." *People v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003). "[W]hen evidence is offered not in an effort to recreate an event, but as an aid to illustrate an expert's testimony regarding issues related to the event, there need not be an exact replication of the circumstances of the event." *Id.* "Beyond general principles of admissibility, the case law of this state has established no specific criteria for reviewing the propriety of a trial court's decision to admit demonstrative evidence." *People v Castillo*, 230 Mich App 442, 444; 584 NW2d 606 (1998). However, "[a]s with all evidence, to be admissible, the demonstrative evidence offered must satisfy traditional requirements for relevance and probative value in light of policy considerations for advancing the administration of justice." *Id.*; see also MRE 401-403.

The trial court permitted Dr. Paul to show the jury some of his computer animations. The court noted that these animations were based entirely on Dr. Paul's calculations and modeling and ruled that they were admissible to assist the jury in understanding Dr. Paul's expert testimony regarding the dynamics of the victim's fall. The computer animations that were admitted into

evidence showed how the victim could have accidentally fallen from the boathouse deck.

In contrast, the trial court excluded some of Dr. Paul's other computer animations. The excluded animations showed the victim falling from the boathouse deck onto the concrete pavement and subsequently moving into the lake by way of involuntary movements such as seizures or convulsions. Unlike the animations that were admitted, the excluded animations were not based entirely on Dr. Paul's calculations and modeling, but were based in part on Dr. Paul's speculation that the victim may have suffered violent seizures or convulsions after striking the concrete pavement.

"The facts or data . . . upon which an expert bases an opinion or inference shall be in evidence." MRE 703. It necessarily follows that an expert witness may not base his or her testimony on facts that are not in evidence. An expert witness need not rule out all competing and alternative theories, but he or she must have a sound evidentiary basis for his or her conclusions. *Green v Jerome-Duncan Ford, Inc*, 195 Mich App 493, 498-499; 491 NW2d 243 (1992).[11] An expert witness's opinion is objectionable if it is based on assumptions that do not accord with the established facts. *Id.* at 499. When an expert's opinion is based on assumptions that are contrary to the facts in evidence, it is technically irrelevant to the actual issues at trial. *Id.*

---

[11] At the time *Green* was decided, MRE 703 provided: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. The court may require that underlying facts or data essential to an opinion or inference be in evidence." See former MRE 703. Nonetheless, we perceive no reason why this difference should change the applicability of *Green* to the facts of this case.

Dr. Paul, a professor of biomechanical engineering, was not a physician. He had no expertise in the field of neurology, nor did he claim to have special knowledge concerning seizures and convulsions. As his testimony made clear, Dr. Paul merely speculated that the victim might have suffered seizures that were sufficiently violent to carry her body from the concrete pavement into the water. In reality, however, the medical testimony at trial indicated that this scenario was highly unlikely. The medical testimony established that although the victim may have experienced a slight seizure or moved involuntarily to a minor extent, she almost certainly did not experience seizures or convulsions to the degree required to actually move her body into the lake from its initial position on the concrete pavement. Because the computer animations showing the victim moving into the water by way of seizures or convulsions were based on conjecture and were inconsistent with the facts in evidence, they were technically irrelevant to the genuine issues in this case. *Id*. The trial court did not abuse its discretion by excluding them from the jury's consideration. See MRE 402.

B

Few rights are more fundamental than that of an accused to present evidence in his or her own defense. *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v South Carolina*, 547 US 319, 324; 126 S Ct 1727; 164 L Ed 2d 503 (2006) (internal quotation marks and citations omitted). This

Court has similarly recognized that "[a] criminal defendant has a state and federal constitutional right to present a defense." *Kurr, supra* at 326.

However, an accused's right to present evidence in his defense is not absolute. *United States v Scheffer*, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1998); *Crane v Kentucky*, 476 US 683, 690; 106 S Ct 2142; 90 L Ed 2d 636 (1986). "A defendant's interest in presenting . . . evidence may thus ' "bow to accommodate other legitimate interests in the criminal trial process." ' " *Scheffer, supra* at 308 (citations omitted). States have been traditionally afforded the power under the constitution to establish and implement their own criminal trial rules and procedures. *Chambers, supra* at 302-303.

Like other states, Michigan has a legitimate interest in promulgating and implementing its own rules concerning the conduct of trials. Our state has "broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " *Scheffer, supra* at 308, quoting *Rock v Arkansas*, 483 US 44, 56; 107 S Ct 2704; 97 L Ed 2d 37 (1987). MRE 703, which requires expert witnesses to base their opinions on facts in evidence, does not infringe on a criminal defendant's right to present a full defense. Instead, it merely serves to ensure that the expert opinions presented in the courts of this state are relevant and reliable. Nor is a criminal defendant's constitutional right to present a defense infringed by MRE 402, which simply bars the admission of irrelevant evidence. These rules of evidence help to ensure the integrity of criminal trials and are neither "arbitrary" nor "disproportionate to the

purposes they are designed to serve." The exclusion of Dr. Paul's computer animations, which showed the victim's body moving into the water by way of seizures or convulsions, did not deny defendant the right to present a defense. See *Scheffer, supra* at 308. We perceive no constitutional error.

XI

Defendant next argues that the trial court erred by allowing Dr. Dragovic to opine that the victim was "pushed, shoved, or punched over the deck railing" because "that opinion was clearly beyond [Dr. Dragovic's] expertise as a forensic pathologist." We disagree.

Defendant preserved this issue by objecting to Dr. Dragovic's opinion testimony concerning the manner in which the victim fell from the boathouse deck. Preserved evidentiary rulings are reviewed for an abuse of discretion. *Hine, supra* at 250.

To be sure, expert testimony must be limited to opinions falling within the scope of the witness's knowledge, skill, experience, training, or education. See MRE 702. Consequently, an expert may not opine on matters outside his or her area of expertise. However, Dr. Dragovic testified at trial that a forensic pathologist's role is not only to establish the *cause of death*, but also to establish the *manner of death*. We agree with this proposition. Although Dr. Dragovic did not perform the autopsy in this case and was not the medical examiner in the county where the victim's death occurred, the relevant statutory law supports the proposition that forensic pathologists are qualified to opine with respect to the manner of a decedent's death. See, e.g., MCL 52.202(1) (stating that "[a] county medical examiner or deputy county medical examiner shall investigate *the*

*cause and manner of death"*) (emphasis added); see also
MCL 52.205(3) (stating that at the time of an autopsy,
the county medical examiner "shall carefully reduce or
cause to be reduced to writing every fact and circum-
stance tending to show the condition of the body and *the
cause and manner of death"*) (emphasis added). We find
further support for the proposition in the caselaw of
other jurisdictions. See, e.g., *Williams v State*, 937 So 2d
35, 43 (Miss App, 2006) (noting that it is the duty of the
forensic pathologist to address both the cause of death
and the manner of death and that "testimony concern-
ing the victim's wounds, suffering, and the means of
infliction of injury falls within the bounds of [the
forensic pathologist's] expertise"); see also *Fridovich v
State*, 489 So 2d 143, 145 (Fla App, 1986) (holding that
it is not beyond a medical examiner's area of expertise
to testify concerning "the manner in which the fatal
wound was inflicted").

On the basis of his review of the autopsy protocol and
photographs, Dr. Dragovic testified that the victim had
sustained injuries that were consistent with a struggle
on the boathouse deck, including internal abdominal
injuries very possibly caused by a punch or kick. Dr.
Dragovic also testified that he has investigated numer-
ous homicides, both as a county medical examiner and
as an independent consultant, and has been called upon
many times to establish both the cause and the manner
of a victim's death. We conclude that it is not beyond a
forensic pathologist's area of expertise to offer testi-
mony in the courts of this state concerning both the
cause of death and the manner of death. Assuming that
the witness is otherwise qualified, a forensic patholo-
gist, such as Dr. Dragovic, may testify as an expert
concerning both the cause and the manner of a dece-
dent's death. The trial court did not abuse its discretion

by allowing Dr. Dragovic to opine that the victim had likely been pushed, shoved, or punched over the deck railing. *Hine, supra* at 250.

XII

Defendant argues in a supplemental brief filed *in propria persona* that defense counsel was ineffective (1) for failing to move for a change of venue, (2) for failing to object to the jury's view of the scene of the offense, (3) for failing to object to the introduction into evidence of the autopsy photographs, and (4) for failing to challenge an allegedly biased potential juror. Defendant is entitled to no relief on these issues.

Because these claims of ineffective assistance of counsel are unpreserved, our review is limited to errors apparent on the record. *Matuszak, supra* at 48.

As noted earlier, "[t]o establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that there is a reasonable probability that, but for the deficiency, the factfinder would not have convicted the defendant." *Snider, supra* at 423-424. Defense counsel is given wide discretion in matters of trial strategy and there is accordingly a strong presumption of effective assistance of counsel. *Matuszak, supra* at 58. Declining to raise objections can often be consistent with sound trial strategy. See *id.*

A

Defendant first contends that defense counsel was ineffective for failing to move for a change of venue. Generally, criminal defendants must be tried in the county where the crime was committed. *People v Jendrzejewski*, 455 Mich 495, 499; 566 NW2d 530 (1997).

"An exception to the rule provides that the court may, in special circumstances where justice demands or statute provides, change venue to another county." *Id.* at 499-500; see also MCL 762.7.[12]

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v Dowd*, 366 US 717, 722; 81 S Ct 1639; 6 L Ed 2d 751 (1961). Therefore, it may be appropriate to change the venue of a criminal trial when widespread media coverage and community interest have led to actual prejudice against the defendant. "Community prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted, and, much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice." *Jendrzejewski, supra* at 500-501. Changes of venue might be required in cases involving "extensive egregious media reporting," "a barrage of inflammatory publicity leading to a 'pattern of deep and bitter prejudice' against the defendant," and "a carnival-like atmosphere surrounding the proceedings." *Id.* at 506-507 (citations omitted). Changes of venue might also be required in cases involving "highly inflammatory attention to sensational details . . . ." *Id.* at 508.

We recognize that there was substantial media interest in this case. We also recognize that Benzie County is a small community that does not generally experience

---

[12] We note that there was no motion to change venue filed in this case and the trial court was under no obligation to change sua sponte the venue of defendant's trial to another county. Indeed, the general rule is that a trial court may change venue in a criminal case only "upon good cause shown by either party . . . ." MCL 762.7.

the degree of media coverage exhibited here. However, defendant has failed to show that the media coverage was anything other than nonsensational, factual coverage. There is no evidence that the coverage was invidious or inflammatory, as opposed to simple factual news reporting. *Id.* at 504. There is simply no indication in the present case that the community was inundated with *adverse* publicity or that this publicity resulted in actual bias against defendant. In sum, the media attention in this case was neither prejudicial nor inflammatory. Therefore, even if a motion had been filed, the trial court would have been under no obligation to change the venue of defendant's trial. Trial counsel was not ineffective for failing to file a meritless motion. *People v Ish*, 252 Mich App 115, 118-119; 652 NW2d 257 (2002).

B

Defendant also contends that trial counsel was ineffective for failing to object to the jury's view of the scene of the crime. "The court may order a jury view of property or of a place where a material event occurred." MCR 6.414(F); see also MCL 768.28 (stating that "[t]he court may order a view by any jury empanelled to try a criminal case, whenever such court shall deem such view necessary"). It is within the trial court's discretion to order a jury view of the crime scene. *People v Winney*, 196 Mich 347, 366; 163 NW 119 (1917).

Defendant concedes that a jury may view the scene of an offense. However, he asserts that the jury view in this case was of little or no use because the boathouse deck and railing had been completely rebuilt between the time of the victim's death and the time of trial. Specifically, defendant suggests that the intervening changes to the boathouse deck and railing rendered the jury view irrelevant. It is true that the boathouse deck

and railing had not been preserved exactly as they were on the evening of October 24, 2003. But we find that the scene remained sufficiently similar to assist the jury in understanding certain concepts at issue in this case, such as the relative distances between objects and the general geographic layout of the Watervale area. Because the jury view assisted the trier of fact, counsel was not ineffective for failing to object to it on the ground of relevancy. Defense counsel was not ineffective for failing to make a futile objection. *People v Milstead*, 250 Mich App 391, 401; 648 NW2d 648 (2002).

Defendant also asserts that the procedure followed in this case was improper because a jury view should not occur until *after* the relevant evidence has been admitted at trial. We agree with defendant that a trial court must generally conduct a jury view *after* the relevant evidence has been admitted at trial because the purpose of a jury view is to enable the jury " 'to comprehend more clearly by the aid of visible objects the evidence already received . . . .' " *Winney, supra* at 367 (citation omitted). "It is true that a jury is not to view the scene . . . in order to augment the evidence introduced on the trial. Such a view is only for the purpose of making clear in their minds the evidence *already introduced.*" *People v Connor*, 295 Mich 1, 6; 294 NW 74 (1940) (emphasis added); see also *People v Curry*, 49 Mich App 64, 67; 211 NW2d 254 (1973) (a jury view of the scene may be ordered to "enable the jurors to comprehend more clearly the evidence already received"). On the basis of this authority, we conclude that the trial court improperly conducted the jury view before any of the relevant evidence or testimony had been presented at trial. Nonetheless, defendant has failed to establish how he was prejudiced by the premature nature of the jury view or by counsel's failure to object to the jury view on this ground. Because defen-

dant has failed to show prejudice resulting from counsel's failure to object on this ground, we can find no ineffective assistance of counsel. *Snider, supra* at 423-424.

C

Defendant next contends that trial counsel was ineffective for failing to object to the introduction into evidence of the autopsy photographs. However, the nature, type, and location of the victim's injuries were all at issue in this case. Moreover, the photographs were necessary to illustrate and augment the complex medical testimony concerning the victim's brain injuries. "Photographs may . . . be used to corroborate a witness' testimony," and "[g]ruesomeness alone need not cause exclusion." *People v Mills*, 450 Mich 61, 76; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). We conclude that the autopsy photographs were relevant, MRE 401, and were not unduly prejudicial to defendant, MRE 403. Defense counsel was not ineffective for failing to make a futile objection to the admission of the photographs. *Milstead, supra* at 401.

D

Defendant contends that counsel was ineffective for failing to challenge during voir dire an allegedly biased potential juror. During voir dire, potential juror Eggleston admitted that certain people had expressed to him their beliefs that defendant was guilty and that defendant's alibi was not logical. The potential juror further admitted that he had read various newspaper accounts of the case. However, he also stated that he had not read anything that would influence his decision and he confirmed that he could "be fair and impartial to both sides."

We conclude that defendant's trial counsel was not ineffective for failing to challenge the potential juror in question. Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions. *People v Robinson*, 154 Mich App 92, 94-95; 397 NW2d 229 (1986). However, as a reviewing court, we "cannot see the jurors or listen to their answers to voir dire questions." *Id.* at 94. For this reason, this Court has been disinclined to find ineffective assistance of counsel on the basis of an attorney's failure to challenge a juror. *Id.* at 95.

"A lawyer's hunches, based on his observations, may be as valid as any method of choosing a jury." *Id.* As explained earlier, lead defense counsel was a capable, experienced attorney. He has tried countless criminal cases. On the basis of his experience, lead trial counsel surely believed that he had attained a reasonable, fair, and honest jury. We will not substitute our judgment for that of defendant's counsel, nor will we use the benefit of hindsight to assess counsel's performance. *Rockey*, *supra* at 76-77. Defendant is entitled to no relief on this issue.

E

Defendant contends that he was denied a fair trial and the effective assistance of counsel as a result of the cumulative effect of trial counsel's errors. It is true that "[t]he cumulative effect of several minor errors may warrant reversal where the individual errors would not." *People v Ackerman*, 257 Mich App 434, 454; 669 NW2d 818 (2003). However, in this case we have found no specific errors in trial counsel's performance. Thus, there are no individual errors that can be aggregated to form a cumulative effect. *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).

XIII

Defendant also argues in his supplemental brief that the trial court denied him the right to a fair trial when it failed to remove juror Eggleston after Eggleston sent a note to the court expressing his doubts about the testimony of Dr. Paul. Again, we disagree.

Defense counsel moved for Eggleston's dismissal from the jury at the time the trial court received his note. Therefore, this issue is preserved. We review for an abuse of discretion the trial court's decision whether to remove a juror. *People v Tate*, 244 Mich App 553, 559; 624 NW2d 524 (2001). An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes. *Babcock, supra* at 269.

After the close of the prosecution's proofs and during the presentation of the defense's case, juror Eggleston sent a note to the court expressing his concerns regarding Dr. Paul's testimony. The note suggested that Eggleston was prepared to make his own demonstrations in the jury room to rebut Dr. Paul's opinions.

The trial court questioned Eggleston about his note outside the presence of the other jurors. After questioning the juror, the trial court denied defense counsel's motion to remove him. The court determined that the juror had not violated his oath and could still serve as an impartial member of the jury. The trial court then instructed the jury not to "investigate anything about the case on your own, or conduct any experiments or do any demonstrations requiring specialized knowledge that you might possess." The court also instructed the jury that "[i]t is important for you to keep an open mind and not make a decision about anything in the case until you go to the jury room to decide the case."

Juror Eggleston confirmed to the trial court that he had not made up his mind, that he had not conducted any experiments in the presence of the other jurors, and that he would consider the opinions of his fellow jurors while deliberating. Eggleston also agreed to refrain from conducting any demonstrations or experiments in the jury room. The trial court was confident that Eggleston would enter into deliberations with an open mind and that he would not attempt to improperly influence his fellow jurors. The trial court's decision not to remove the juror fell within the range of reasonable and principled outcomes. *Babcock, supra* at 269. We cannot conclude that the trial court abused its discretion by allowing the challenged juror to continue as a member of the jury. *Tate, supra* at 559.

XIV

Defendant next argues in his supplemental brief that the office of the Attorney General improperly intervened in this case. We disagree.

Because this issue was not raised below, we review it for outcome-determinative plain error. *Carines, supra* at 763-764.

"[T]he attorney general . . . may, when in his own judgment the interests of the state require it, intervene in and appear for the people of this state in any- . . . court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested." MCL 14.28. It is beyond dispute that the people of the state of Michigan are a party to felony prosecutions in this state. We recognize that the Attorney General's statutory discretion to intervene in cases "is not unlimited." *People v Johnston*, 326 Mich 213, 217; 40 NW2d 124 (1949). Indeed, "[c]ourts acting within their inherent powers of judicial control . . . may

restrain the intervention of the attorney general" when there is a showing that such intervention would be "clearly inimical to the public interest . . . ." *Id*. However, there has been no such showing in this case. We find no plain error.

XV

Defendant also argues in his supplemental brief that the prosecution denied him a fair trial by conspiring to withhold potentially exculpatory evidence. Specifically, defendant appears to argue that Dr. Dragovic somehow improperly influenced or coached the testimony of Dr. McKeever, that the prosecution was aware of this, and that the prosecution failed to disclose this fact to the defense. Defendant's argument in this regard is without merit. The mere fact that Dr. Dragovic spoke with Dr. McKeever before trial about the evidence in this case does not in any way support defendant's argument that Dr. Dragovic improperly influenced Dr. McKeever or that the prosecution conspired "to withhold potentially exculpatory testimony of an expert witness."

XVI

Lastly, defendant argues in his supplemental brief that he was denied a fair trial by virtue of the cumulative effect of the errors in this case. We disagree. As noted above, "[t]he cumulative effect of several minor errors may warrant reversal where the individual errors would not." *Ackerman*, *supra* at 454. "However, in order to reverse on the basis of cumulative error, 'the effect of the errors must [be] seriously prejudicial in order to warrant a finding that defendant was denied a fair trial.' " *Id*. (citation omitted). The only errors that we have identified in this matter were minor and did

not seriously prejudice defendant. Consequently, "[t]here are no errors that can aggregate to deny defendant a fair trial." *Id.*

## XVII

We decline to address defendant's suggestion that the trial court erred by failing to sequester the jury. This issue is not properly presented for review because it has not been raised in defendant's statement of the questions presented. MCR 7.212(C)(5); *People v Albers*, 258 Mich App 578, 584; 672 NW2d 336 (2003).

Affirmed.