*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

WILBERT JAMES LOWE II,

      Defendant-Appellee.

UNPUBLISHED
November 21, 2023

No. 365340
Calhoun Circuit Court
LC No. 2022-001082-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

THOMAS HARDING SMITH III,

      Defendant-Appellee.

No. 365460
Calhoun Circuit Court
LC No. 2022-001089-FC

---

Before: GLEICHER, C.J., and SWARTZLE and YATES, JJ.

PER CURIAM.

These consolidated appeals present the same question: whether the trial court correctly suppressed purported dying declarations made by Quinton Williams that identified defendants Wilbert Lowe II and Thomas Smith III as responsible for the shooting that led to Williams's death. The trial court ruled the statements inadmissible under MRE 804(b)(2), and we affirm.

## I. BACKGROUND

Williams was shot on June 28, 2020, in Albion, Michigan. Detective William Lazarus responded to the scene around 5:00 p.m. to investigate a report of shots fired, and he discovered Williams lying in the front yard of a home, bleeding with multiple bullet wounds. Other officers

-1-

also responded. Williams was transported to the hospital, where he underwent emergency surgery, but he died within a month of the shooting.

Before his death, Williams made three separate identifying statements now at issue. Williams first identified Lowe and Smith as his shooters to Deputy Suleiman Sumbal after being loaded into an ambulance at the scene. Williams repeated the accusation, and explained to Sumbal the circumstances of the shooting, once he was at the hospital and before undergoing emergency surgery. Both statements were recorded on Sumbal's body camera. Finally, the day after the shooting, while Williams was intubated and unable to speak following his surgery, he used a white board to ask, "where those n*****s at[?]" Williams followed this question by writing four names, again identifying Lowe and Smith. Williams's wife, Felish Williams (Felish), took a picture of the whiteboard and sent it to police. Williams never directly expressed any fear or belief of impending death before or during these statements. However, following these statements, either on the third or fourth day of William's hospitalization and after he was intubated for a second time, he asked his doctor via the white board whether he was dying.

The prosecution charged both defendants with open murder, MCL 750.316, and several other charges. Both Lowe and Smith moved to suppress Williams's statements of identification, arguing that they were inadmissible and did not qualify as dying declarations because they were insufficiently supported by either direct or circumstantial evidence that Williams made the statements under a belief of impending death. The prosecution responded that Williams's statements were admissible under MRE 804(b)(2) because circumstantial evidence allowed a reasonable inference that Williams made the statements while under the reasonable belief that he faced impending death. The trial court held an evidentiary hearing on defendants' motions.

After reviewing the relevant body camera video, photographs, testimony, and Williams's autopsy report, the trial court agreed with Lowe and Smith, and suppressed William's purported dying declarations. The court reasoned as follows:

> The Court is well aware, as I know the parties are, that dying declarations are extremely rare. They just don't happen very often and they are uncommonly used, very seldom used in prosecution of cases, of cases because they don't happen very often. When statements do happen, very rarely do they happen under the specific circumstances that are required under the rule of evidence for them to be admissible.

> I appreciate [the prosecution's] efforts in this regard on behalf of the victim to bring justice for Mr. Williams' death and wanting to use the specific evidence in the prosecution. It can be very damning, given what I've heard. If it was admitted, it would be very damning.

> However, there is a rule. And that is 804(b)(2), which is statements under belief of impending death. And the one thing I would say is injury, pain is not impending death. Surgery is not impending death. Impending death is when the person—and we had a lot of reference to the outside circumstances, which I understand, but I'm looking at Mr. Williams. And did he ever indicate, behave in

any way [to] direct attention to the fact that hey, I'm dying. Yes, he did. Four days after he was in the hospital. That's when he asked the doctor am I dying.

There were some issues on the scene where he said I'm going down. But if you watch the video, he's going down physically. He's going down to the ground when he was trying to stand up to get on the gurney. So that's my interpretation of that.

And when he's talking in the ambulance, he's very coherent. They were working on him, yes. There was no indication through the tenor of his voice, through his actions that he is, in any way, concerned about passing away, other then [sic] he's just trying to give information to the officer. Now as he indicated, he was away from the scene, he's giving them the information—not because he's dying; because he said he would later one [sic] when he was away from there.

Then when he's in the trauma room or emergency room, he gives a statement. There's no indication based upon his behavior, the tone of his voice, the emotion that he's showing, that he believes he's going to die.

Again, with his wife, he is on a ventilator and he's writing out on a white board. But again, there is no indication whatsoever that he has a belief of impending death. Only four days after he's admitted, so three days, two days after he, uh, makes the statement on the white board, does he indicate that he asked the question of the doctor am I dying.

And I think [Smith's counsel] made a comment that if he had written out these names or made a statement after that, uh, it would be a more interesting question than this one. But when I look at the three prongs of this test as set forth in the rules of evidence and the case law that's been cited by the parties, the different interpretations, prong number two simply has not been, been met in this case. There is no indication that when [Williams] made these statements, naming these names, was he under the impression that he was going to be dying. And therefore, they're not admissible in trial and will not be admitted.

These appeals followed.

## II. ANALYSIS

We review a trial court's admission of evidence under a hearsay exception for an abuse of discretion. *People v Stamper*, 480 Mich 1, 4; 742 NW2d 607 (2007). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 259; 749 NW2d 272 (2008).

"Hearsay is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c) (quotation marks omitted). Generally, hearsay is "inadmissible unless it falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence." *Stamper*, 480 Mich at 3; see also MRE 802. MRE 804(b)(2) is a hearsay exception "commonly known as the dying declaration

exception." *Stamper*, 480 Mich at 4. MRE 804(b)(2) "provides that a statement by a declarant is admissible if the declarant is unavailable as a witness and the statement was made 'while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death.' " *Id*., quoting MRE 804(b)(2). Our Supreme Court instructed in *Stamper*:

> Before admitting a statement as a dying declaration, the trial court must make a preliminary investigation of the facts and circumstances surrounding the statement. The trial court, in advance of the proof of the declaration itself, may allow evidence as to the circumstances under which the dying declaration was taken to show whether it was really taken when the declarant was under the conviction of approaching and inevitable death . . . . If the surrounding circumstances clearly establish that the declarant was *in extremis*[1] and believed that his death was impending, the court may admit statements concerning the cause or circumstances of the declarant's impending death as substantive evidence under MRE 804(b)(2). [*Id*. (quotation marks and citations omitted; omission in original).]

"It is fundamental that a dying declaration is inadmissible in evidence, unless made under a solemn belief of impending death." *People v Johnson*, 334 Mich 169, 173; 54 NW2d 206 (1952) (quotation marks omitted). However, "the rule imposes no requirement that the declarant actually died in order for a statement to be admissible as a dying declaration." *People v Orr*, 275 Mich App 587, 596; 739 NW2d 385 (2007). Additionally, it is unnecessary "for the declarant to have actually stated that he knew he was dying in order for the statement to be admissible as a dying declaration." *People v Siler*, 171 Mich App 246, 251; 429 NW2d 865 (1988).[2] "The declarant's belief may be shown by the apparent fatal quality of the wound, by statements made to the declarant by the doctor or by others that his condition is hopeless, and by other circumstances." *People v Schinzel*, 86 Mich App 337, 343; 272 NW2d 648 (1978), rev'd on other grounds 406 Mich 888 (1979).

Williams unquestionably sustained life-threatening gunshot wounds. The issue here is whether "the surrounding circumstances clearly establish[ed] that . . . [Williams] was *in extremis* and believed that his death was impending" when he identified the shooters. See *Stamper*, 480 Mich at 4. As mentioned, Williams made three apparent statements of identification at issue here—two to Deputy Sumbal on the day of the shooting, and one to his wife, Felish, the next day.

---

[1] The phrase "in extremis" means "in the last illness." Black's Law Dictionary (5th ed), p 699.

[2] Although this Court is not required to follow cases decided before November 1, 1990, see MCR 7.215(J)(1), a published case decided by this Court "has precedential effect under the rule of stare decisis," MCR 7.215(C)(2). See also *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) (stating that although this Court is not "strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990," those opinions are nonetheless "considered to be precedent and entitled to significantly greater deference than are unpublished cases.").

As an initial matter, viewed in isolation, some circumstantial evidence allows an inference that Williams believed his death was imminent when identifying Smith and Lowe as the shooters. Williams was shot at least three times, once each in the shoulder, thigh, and stomach. Both Detective Lazarus and Officer Dan Riley testified that when they arrived on scene, Williams was lying on the ground with his shirt soaked in blood. Lazarus described Williams as "bleeding profusely" and in poor condition. Williams had difficulty breathing and repeatedly asked for help. He also specifically requested medical assistance. On several occasions, Williams lost consciousness or bordered on a loss of consciousness. And Williams needed assistance after unsuccessfully attempting to place himself on a gurney.

Felish testified that she could see the fear in Williams's eyes when he looked at her. Both Lazarus and Riley worked to stem additional blood loss, and Lazarus did not think Williams was going "to be okay." Further, Williams was emergently transported to the hospital, treated by two medics on the way, and required emergency surgery.

Considering these circumstances in isolation, the evidence sufficed to sustain an inference that Williams believed he faced imminent death when he identified Smith and Lowe as his shooters. See *People v Haynes*, unpublished per curiam opinion of the Court of Appeals, issued July 16, 2009 (Docket No. 281998), pp 5-6 (hearsay statement of the declarant identifying the shooter was admissible as a dying declaration where the victim was holding his chest and bleeding, experiencing significant pain, and in dire physical condition when he made the statement); *People v Jackson*, unpublished per curiam opinion of the Court of Appeals, issued November 6, 2007 (Docket No. 271805), pp 3-4 (hearsay statement of the declarant identifying the assailant was admissible as a dying declaration where the victim, a "physically weak, wheelchair-bound, 87-year-old man," (1) was stabbed four times in the neck; (2) bled out significantly, felt cold, looked pale, and was drifting in and out of consciousness by the time help arrived; and (3) deteriorated significantly once hospitalized).

However, *all* the circumstances surrounding the giving of the statement must be considered when deciding whether Williams was in extremis and believed his death was impending. Here, the record reveals a lack of any sense of urgency on Williams's part to disclose the identity of his assailants. He was repeatedly asked by Lazarus and Riley about the circumstances of the shooting and the identity of the shooter or shooters. Each question produced essentially the same answer: "Yeah, I know [who shot me], I need to get help first. . . . I'm gonna tell you what's going on[, i.e., what happened], just get me some help." Additionally, while waiting for the ambulance to arrive, Williams repeatedly asked for someone to get his cell phone out of his car, and Lazarus testified that Williams initially seemed more concerned about his cell phone than his injuries. Further, when the ambulance arrived, Williams attempted to get onto the gurney himself, albeit without success. According to Deputy Sumbal, Williams seemed "pretty alert" and able to respond to questioning.

Williams expressed no sense of any need for urgent disclosure of the identify of his assailants. His consistent and repeated responses, his preoccupation with his cell phone, his general alertness, and his attempt to stand independently all tend to refute that Williams held a present belief of his own imminent death. Rather, these facts strongly suggest that Williams believed that after prompt medical attention, he would be alive to identify his assailants to the police in the future.

Indeed, the body camera videos show that once medical assistance was underway in the ambulance and at the hospital, Williams readily volunteered the identity of his assailants and provided a coherent description of the events of the shooting. He did so in a clear and strong voice. The videos reveal no obvious evidence of panic from Williams when he gave his first two identifying statements, and no sense that Williams was in a race against time to identify his assailants before his life ended. Contra *People v Thompson*, unpublished per curiam opinion of the Court of Appeals, issued January 24, 2013 (Docket No. 305760), pp 2-3 (the declarant clearly believed his death was imminent not only because of "the nature and location" of the victim's gunshot wound, *but also* given "the victim's progressively worsening condition," "heightened desperation for assistance" and increasingly frequent pleas for help during a 911 call, as well as his panic and hysterics once police arrived).

Regarding the final statement of identification via white board, Felish testified that Williams used the white board to first ask where their daughter was. As discussed, he then asked a question, and followed the question by listing four names, purportedly again identifying Lowe and Smith as his shooters. The content of these last two communications suggests that the disclosure of identity was made in anger, not fear of imminent death. Finally, the record disclosed that Williams first asked about whether he was dying two or three days after the shooting, after all of the statements at issue, after he underwent emergency surgery, after he was briefly removed from the ventilator, and after being placed on a ventilator again. We find it significant that Williams made his first clear indication of concern for his possible death at least one day after his final identifying statement, and only after an unsuccessful attempt to remove him from the ventilator.[3]

Given the conflicting evidence here, it was not outside the range of reasonable and principled outcomes for the trial court to conclude that the surrounding circumstances, in totality, did not *clearly* establish that Williams was in extremis and believed that his death was impending at the time of his various statements.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle
/s/ Christopher P. Yates

---

[3] Felish was unsure whether Williams made his question to the doctor about dying on the third or fourth day of his hospitalization, but she said this "probably" occurred on the fourth day. Felish testified that Williams's ventilator was initially removed on the third day, but he was reintubated within 24 hours and subsequently questioned the doctor about whether he was dying.