*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ISAAC SISCO KNEPPER,

Defendant-Appellant.

FOR PUBLICATION
September 23, 2024
11:23 AM

No. 363191
Crawford Circuit Court
LC No. 19-004490-FC

Before: PATEL, P.J., and YATES and SHAPIRO,* JJ.

PER CURIAM.

Defendant, Isaac Sisco Knepper, appeals of right his conviction and sentence for the crime of attempt to commit first-degree criminal sexual conduct (CSC-I). On appeal, defendant asserts that his conviction was against the great weight of the evidence. Defendant also argues that it was improper for his presentence investigation report (PSIR) to refer to acquitted conduct. We affirm defendant's conviction and sentence, but remand for modification of his PSIR.

## I. FACTUAL BACKGROUND

This case resulted from a sexual encounter between the victim and defendant that occurred inside defendant's house on July 17, 2019. That day, the victim was visiting her father, who had a cabin across the street from defendant's house. The victim had never met defendant, but she had seen him in passing.

In the hours before the incident, the victim was at her father's cabin with her father and his friend, George. The victim drank beer while she was there. At some point that evening, defendant came over to the cabin, but he left shortly thereafter. Later that evening, the victim left her father's cabin and went over to defendant's house by herself after telling her father that she was going for a walk. She did not inform her father that she was going to defendant's house.

---

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

At defendant's house, the victim drank one shot of tequila with defendant. After drinking tequila, the victim and defendant began making out, which she said was consensual. After kissing defendant, the victim went to the bathroom and she testified that when she returned from the bathroom, defendant was naked from the waist down, his penis was erect, and he was motioning for her to perform oral sex on him. She testified that she told defendant "no" and said she did not want to do that, but he kept trying to push her head down and put his penis in her mouth while his hands were on her head. The victim said he did not pry open her mouth, hold her nose closed, or touch her face at all. In her later testimony, she stated that she did not consent to oral sex with defendant and in an unsuccessful attempt to get away, the victim bit defendant's penis, after which defendant grabbed her by the shoulders and threw her to the ground, causing her to fall and hit her head.

The victim's accounts of what happened next are inconsistent. She testified that she might have lost consciousness as a result of being thrown down, but at other times she claimed that she lost consciousness as a result of defendant choking her. Whether the victim lost consciousness, and for how long, is unclear. In an interview that occurred days after the incident, the victim told a police officer that she was conscious throughout the encounter, but then she said that she thought she lost consciousness for a few seconds when defendant was strangling her. At trial, she said that she thought she had only lost consciousness for "a few minutes," but she later stated that the force of her head hitting the ground caused her to lose consciousness for an unknown period of time, which she said "could have been an hour . . . could have been two hours." She later testified that she did not know how long she was unconscious, and she was "just assuming" when she testified that it was one to two hours. She also later testified that the cause of her loss of consciousness was defendant strangling her.

According to the victim, when she regained consciousness, defendant's hands were around her neck "[r]eally tight." She explained that, after she was pushed down, a struggle ensued and defendant dragged her into different dark rooms in the house and threw her around. While she was on the ground, she did not see or feel defendant's penis. During that time, defendant was not saying anything to her, but she thought he was trying to rape her because of the force he used. The victim scratched defendant and eventually was able to get away from him and run out of the house. Once outside, she fell and hurt her knee. During the incident, the victim lost the glasses that she had been wearing.

The victim stated that her shorts and shirt remained on throughout the encounter. She said she did not remember defendant ever taking her pants off or touching her underneath her shorts or shirt. Previously, the victim told a nurse examiner that her pants were removed during the incident. In an interview with a police officer the day after the incident, she informed the officer that there had been no penetration and that defendant never took her clothes off. An hour-long video of that interview was played for the jury at trial.

After she left defendant's house on the evening of the incident, the victim went back to her father's cabin. She testified that when she returned to her father's cabin, he and George were there. She was really upset about what had happened and "couldn't really get the words out about what happened," so no one could understand her. The two men described her as being hysterical. She wanted to return to defendant's house to retrieve her phone and her glasses, but she did not end up going back. She did not call 911 that evening because she was ashamed, and she testified that she

also did not say anything to her father or George about the sexual assault because of that shame. Instead, she told them she was upset because she had left her phone at defendant's house.

The victim's description of what followed was somewhat inconsistent. She stated on direct examination that her father tried to calm her but they were "arguing a little bit," at which point she pushed over a coffee table. She said that her father never touched her, a claim she reiterated during cross-examination. But the victim later acknowledged that she got into a physical altercation with her father, who tackled her, and she was thrashing on the ground. The victim's father testified that he tried to grab the victim and the two of them fell to the ground. Eventually, she acknowledged that there were parts of the altercation with her father that she remembered and parts that she could not remember, so her injuries could have happened during that altercation.

Defendant then came over and spoke to the victim. The victim's father testified that during that conversation, she "was upset and then she was calm," and said "you did this to me," referring to a mark on her neck and the bruises. Defendant responded that he had not done that.

Two nearby residents called 911 because they observed a man and a woman fighting. They also asserted that the fighting had been going on for hours. Trooper Greg Fleming of the Michigan State Police and Deputy Dylan Golightly, who was a trooper with the Michigan State Police at that time, responded to the call. When they arrived, Trooper Fleming went inside the cabin and spoke with the victim. He said that she was in a state of shock, crying and not answering questions, that what she was saying was not making sense, and that she was covering her neck. Trooper Fleming asked the victim to move her hand, and he noticed a scratch on her neck. She did not tell him that she had been sexually assaulted. Trooper Fleming believed the marks on the victim's body were signs of a physical altercation. Trooper Fleming then walked out of the cabin and asked Deputy Golightly to go talk to the victim.

Deputy Golightly spoke with the victim inside the cabin. While inside, he noticed a broken coffee table and a mark on the victim's neck. At that time, Deputy Golightly said that the victim was very upset, crying, and unwilling to discuss the mark on her neck. Deputy Golightly testified that the victim told him during that conversation that defendant had sexually assaulted her and had choked her. But the victim testified that she did not tell police that she had been sexually assaulted, and that the reason she was eventually taken to the victim advocate center was because her injuries suggested that she had been physically assaulted. The victim also testified, however, that police officers asked her if she wanted to undergo a rape examination.

After speaking with the police, the victim went to Roscommon Advocate Center to provide a rape kit. A physical examination of the victim was performed, which revealed multiple injuries on her body, consisting of numerous bruises on her face, legs, and arms, petechiae on her eyes and around her neck, and an abrasion on her genitals. The nurse examiner did not remember seeing injuries to the victim's mouth and found no evidence to suggest forcible entry of defendant's penis into the victim's mouth. At trial, the prosecution presented photographs showing scratches on the victim's face, a scratch mark on her neck, a bruise on her arm, marks on her knee, and a bruise on her buttocks. During the examination, the nurse examiner took the underwear and sanitary pad the victim had been wearing. The victim provided a urine sample, which revealed that the victim had a blood alcohol level of .286. The victim acknowledged that she was intoxicated, but she said that she remembered everything that had happened.

Several days after the incident, the police obtained a warrant for defendant's arrest and then arrested him at his home. While transporting defendant to the police department, Deputy Golightly questioned him. Defendant admitted that he and the victim had kissed and, when defendant let go of her waist, she fell over. Defendant told Deputy Golightly that, at some point, he and the victim were in bed and she performed oral sex on him, but she stopped when she thought she was going to be sick. Then she returned to her father's cabin.

The sanitary pad the victim was wearing was tested for DNA, which revealed the presence of DNA from two individuals other than the victim. A comparison of the DNA in that sample with a reference sample from defendant yielded the conclusion that it was 3,000 times more likely that the mixture contained DNA from defendant than from two unknown people. Although the source of the DNA was unknown, the source was narrowed down to either seminal fluid or saliva. The scientist who testified at trial stated that it would be possible for a woman's sanitary pad to contain DNA from somebody she was kissing if she went to the bathroom afterwards, but the amount of defendant's DNA in the sample would not be consistent with "a simple transfer of two individuals making out."

Defendant was charged with CSC-I, attempted CSC-I, unlawful imprisonment, and assault with intent to do great bodily harm less than murder or by strangulation. In the CSC-I charge, the prosecution alleged that defendant penetrated the victim's mouth with his penis by means of force or coercion causing personal injury. For attempted CSC-I, the prosecution alleged that defendant attempted to commit sexual penetration of the victim's genital opening with his penis. The charge of unlawful imprisonment was based upon the allegation that defendant knowingly restrained the victim to facilitate the commission of CSC-I or strangulation. For the charge of assault with intent to do great bodily harm less than murder or by strangulation, the prosecution alleged that defendant assaulted the victim by strangulation or suffocation.

At trial, during cross-examination, the victim testified that defendant raped her. This was the first time she had told anyone that she believed that defendant actually raped her, and defendant had not been charged with rape. She testified that she did not know she was raped until nearly a year after the incident when she was told by a police officer in April 2020. She said that it was the results of the rape kit, which revealed defendant's DNA on the sanitary pad she was wearing that night, that indicated to her that she had been raped. When the prosecutor asked the victim if she remembered defendant's penis entering her vagina, she said she did not remember. She reiterated that she believed she was raped "[b]ecause that is what the state trooper told [her] when he called [her] in April of 2020 when the State finished [her] rape kit." The trial court asked defendant if he wished to request a mistrial because of this allegation being made for the first time at trial, but defense counsel responded that he would rather continue with the trial and use that allegation to attack the victim's credibility.

The jury ultimately found defendant guilty of attempted CSC-I, but not guilty of CSC-I, unlawful imprisonment, and assault with intent to do great bodily harm less than murder or by strangulation.

At sentencing, defense counsel argued that several parts of the "Agent's Description of the Offense" section of the PSIR contained facts that the jury had found to be inaccurate, as revealed by the not-guilty verdicts. The trial court explained that the agent-description section was derived

from the police report of the incident, and unless that description was inaccurate, it would remain in the PSIR. The trial court agreed to add a sentence noting that defendant denied physically assaulting the victim, but the trial court declined defendant's request to state that the jury's verdict supported defendant's claim of innocence.

During defendant's sentencing hearing, the trial court noted the seriousness of the crime of CSC-I. It also took into account the impact the crime had on the victim. The trial court sentenced defendant to serve a minimum prison term of 58 months—which was at the top of the sentencing guidelines range—and a maximum prison term of 40 years. In doing so, the trial court stated that it was not sentencing defendant for any acquitted conduct. This appeal followed.

## II. LEGAL ANALYSIS

On appeal, defendant challenges his conviction for attempt to commit CSC-I by contending that the jury verdict was against the great weight of the evidence. Beyond that, defendant contests his sentence, asserting that the inclusion of acquitted conduct in the PSIR was improper. We shall address each of these arguments in turn.

## A. GREAT WEIGHT OF THE EVIDENCE

Defendant characterizes his conviction for attempt to commit CSC-I as against the great weight of the evidence. He insists that the victim's testimony was so patently implausible that it could not be believed by any reasonable juror. He further contends that his theory of the case was not impeached, and that an extraneous influence on the jury—the victim asserting for the first time at trial that defendant raped her—caused the guilty verdict. To be sure, the evidence that supports defendant's conviction was inconsistent and the victim's credibility was questionable. The record nonetheless demonstrates that defendant has failed to meet the high standard for establishing that his conviction was against the great weight of the evidence. Therefore, we conclude that defendant is not entitled to a new trial on the basis of the weakness of the evidence.

Defendant did not move for a new trial in the lower court based on the great weight of the evidence, so this issue is unpreserved. See *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003). When an issue is not preserved, this Court's review is limited to plain error affecting substantial rights. *Id*. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

Under MCR 2.611(A)(1)(e), "[a] new trial may be granted to all or some of the parties, on all or some of the issues, whenever their substantial rights are materially affected, for any of the following reasons: [a] verdict or decision [is] against the great weight of the evidence or contrary to law." MCR 2.611(A)(1)(e). "The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Musser*, 259 Mich App at 218-219. "The hurdle that a judge must clear in order to overrule a jury and grant a new trial is unquestionably among the highest in our law." *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008)

(quotation marks and citation omitted). As a general principle, "a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009).

"Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998). "[A]bsent exceptional circumstances, issues of witness credibility are for the jury, and the trial court may not substitute its view of the credibility for the constitutionally guaranteed jury determination thereof." *Id.* at 642 (quotation marks omitted). "[U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id.* at 645-646 (quotation marks and citation omitted). The trial court may also override the jury's credibility determination when the testimony is "patently incredible" or it is "so inherently implausible that it could not be believed by a reasonable juror, or where the witnesses [sic] testimony has been seriously impeached and the case marked by uncertainties and discrepancies." *Id.* at 643-644 (quotation marks and citation omitted). Thus, to obtain a new trial, the defendant must establish that one of these circumstances exists, and that there is a "real concern that an innocent person may have been convicted or that it would be a manifest injustice to allow the guilty verdict to stand." *Id.* at 644. This Court "must, despite any misgivings or inclinations to disagree, leave the test of credibility where our system reposed it—in the trier of the facts." *Id.* at 646 (quotation marks and citation omitted).

Here, the jury convicted defendant of attempt to commit CSC-I, which requires proof that defendant intended to commit CSC-I, that defendant took an action toward committing the crime, and that that action was clearly and directly related to the CSC-I and not some other objective. On appeal, defendant contests the jury verdict on several grounds. First, he contends that the victim's testimony was so patently incredible and inherently implausible that it could not be believed by a reasonable juror. The victim testified that she thought defendant was trying to rape her "[b]ecause he was very forceful." She testified that when she returned from the bathroom, he was naked from the waist down and his penis was erect. She also testified that while he was in that state of undress, he physically assaulted her and dragged her to different rooms of his house, and she only escaped after she fought him off. In addition, defendant's DNA was found inside of the victim's underwear on her sanitary pad, and an expert witness testified that it was unlikely the DNA could have wound up there just by the pair kissing and then the victim going to the bathroom. Conversely, there was evidence in the form of defendant's recorded interview with Deputy Golightly suggesting that the sexual encounter was consensual. At its core, the entire case was a credibility contest between the victim's trial testimony and various recorded statements presented to the jury.

The victim's trial testimony and her statements made before trial were plainly inconsistent, but we must assess those inconsistences mindful of the high bar that defendant must clear to obtain relief based on the victim's credibility. See *Unger*, 278 Mich App at 232. We can only overturn a jury's credibility determination in "exceptional circumstances," *Lemmon*, 456 Mich at 642, and it must be the case that "directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities . . . ." *Id.* at 645-646.

-6-

Defendant cites aspects of the victim's testimony that he found to be particularly incredible or inconsistent, like her testimony about her willingness to drink at defendant's house, the physical altercation she had with her father after she left defendant's house, and the length of time that she lost consciousness. But defendant does not identify any specific element of the crime of conviction that he believes is negated by inconsistent testimony. For example, defendant thoroughly attacks the victim's testimony about the altercation she had with her father on the night in question, but defendant does not explain how inconsistent testimony on that issue supports his argument that his conviction of attempt to commit CSC-I was against the great weight of the evidence.

Despite the victim's credibility issues, we cannot say that her testimony was impeached to the point that it was deprived of all probative value or that the jury could not believe it, or that her testimony contradicted indisputable physical facts or defied physical realities. See *id*. We might have made a different credibility determination than the jury, but we cannot overturn defendant's conviction on that basis, especially in light of the jury's decision to acquit defendant on several of the charges. *Id*. at 646. Simply stated, the record contains ample evidence to support defendant's conviction for attempt to commit CSC-I, so defendant is not entitled to a new trial on the basis of the great weight of the evidence.

Defendant asserts that his theory of the case was not impeached, which supports his claim that his conviction was against the great weight of the evidence. Under his theory, the victim "was ashamed of what she did, incurred the wrath of her father, and shifted the blame onto" defendant. But weighing defendant's theory against the prosecution's theory gives rise to a credibility contest between the victim's insistence that her sexual encounter with defendant was not consensual and defendant's assertion that it was consensual. The victim denied there was any physical altercation between herself and her father, but the evidence that that altercation took place leaves no doubt of its occurrence. The fact that the victim's father would not have approved of his daughter engaging in sexual acts with defendant could bear upon the victim's credibility, but it does not negate her version of events, so the issue remains one of credibility. Again, this case turned on the credibility of the victim, and this Court ought not disturb the jury's credibility determination. Moreover, even if defendant was correct in claiming that the victim and her father engaged in a violent altercation, that does not negate the victim's claim that defendant committed the offense of attempt to commit CSC-I. In this credibility contest, this Court must leave the jury's verdict undisturbed.

Defendant puts forth an additional argument that does not actually pertain to the evidence presented at trial. He claims the prosecution's theory of the case shifted during trial from insisting that defendant used physical force to asserting that the victim was too intoxicated to consent, and that this shift bolsters his position on appeal that his conviction was against the great weight of the evidence. But this argument fails to address the evidence presented at trial. We must rely on the evidence contained in the lower-court record. We conclude that a shift in the prosecution's theory of the case during the trial is immaterial to our analysis of that evidence.

Finally, defendant argues that it was an extraneous influence on the jury's verdict that the victim testified at trial that she was vaginally raped by defendant, an allegation that was made for the first time during trial. But defendant waived his challenge to the admission of that testimony, and therefore extinguished any error. Waiver is "the intentional relinquishment or abandonment of a known right." *Carines*, 460 Mich at 762 n 7 (quotation marks and citation omitted). A defendant who waives a right may not request appellate review of a deprivation of the right, "for

his waiver extinguished any error." *People v Carter*, 462 Mich 206, 216; 612 NW2d 144 (2000) (quotation marks and citation omitted). In order to waive a known right, a defendant must "clearly express[] satisfaction with a trial court's decision . . . ." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). Engaging in appellate review of a waived issue is not permissible because it "would allow counsel to harbor error at trial and then use that error as an appellate parachute[.]" *Id.* at 505 (quotation marks omitted).

At trial, on a break after defense counsel's cross-examination of the victim that resulted in the victim's allegation that defendant raped her, the trial court asked defense counsel if he wanted to request a mistrial because that allegation of rape had not been made previously. Defense counsel repeatedly and unequivocally stated that he did not want a mistrial and did not want that testimony stricken. Defendant explained that he preferred to question the victim about her claim and establish inconsistencies in her testimony, believing the testimony was beneficial to him. Defense counsel discussed that testimony in his closing argument, contending it showed the victim was not credible. Defendant waived any challenge he may have had to the admission of the testimony by clearly and repeatedly expressing satisfaction with its admission. See *Kowalski*, 489 Mich at 503.

In sum, although the evidence supporting defendant's conviction was not strong, consisting primarily of the victim's testimony which suffered from inconsistencies and an accompanying lack of credibility, the bar defendant must clear to obtain relief in the form of a new trial is exceedingly high. On this record, we conclude that defendant has failed to meet that high standard.

## B. ACQUITTED CONDUCT IN THE PSIR

We conclude that defendant is not entitled to resentencing on the grounds that the PSIR included information about crimes for which defendant was acquitted. We do so because the trial court made clear that it was not relying on that information in fashioning defendant's sentence. A sentencing court cannot rely on acquitted conduct when imposing a defendant's sentence. *People v Beck*, 504 Mich 605, 609; 939 NW2d 213 (2019). However, inclusion of facts in the PSIR that are inconsistent with an acquittal is not sufficient grounds for resentencing absent evidence that the trial court relied on that inaccurate information when imposing sentence, a requirement that defendant concedes is not met in this case. *People v Stokes*, 333 Mich App 304, 311; 963 NW2d 643 (2020) ("[A] sentencing court may review a PSIR containing information on acquitted conduct without violating *Beck* so long as the court does not rely on the acquitted conduct when sentencing the defendant."). A PSIR "must be succinct and, depending on the circumstances, include . . . a complete description of the offense and the circumstances surrounding it," MCR 6.425(A)(1)(b). On the basis of *Stokes* and MCR 6.425(A)(1)(b), a panel of this Court concluded in an unpublished opinion that so long as the trial court does not rely on the challenged material, it need not be redacted from the PSIR, provided that it accurately describes the conduct of the investigation even if the ultimate outcome is an acquittal. *People v Montez*, unpublished per curiam opinion of the Court of Appeals, issued March 10, 2022 (Docket No. 353119), pp 17-18.[1] Given the cases and

---

[1] "Although unpublished opinions of this Court are not binding precedent, they may . . . be considered instructive or persuasive." *Paris Meadows, LLC v Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010) (citations omitted); see MCR 7.215(C)(1).

court rule, we conclude that the challenged information need not be redacted from the PSIR. Thus, defendant is not entitled to have information about acquitted conduct removed from his PSIR.

But defendant accurately points out that his PSIR will have substantial effects throughout his term of imprisonment, an issue not considered in *Stokes* or *Montez*. And it is clear that the narrative included in the PSIR "follows . . . defendant to prison . . . [and] may have ramifications for purposes of security classification or parole consideration . . . ." See *People v Maben*, 313 Mich App 545, 553; 884 NW2d 314 (2015). Indeed, the governing statute, MCL 771.14(6), states that:

> At the time of sentencing, either party may challenge, on the record, the accuracy or relevancy of any information contained in the presentence investigation report. The court may order an adjournment to permit the parties to prepare a challenge or a response to a challenge. If the court finds on the record that the challenged information is inaccurate or irrelevant, that finding shall be made a part of the record, the presentence investigation report shall be amended, and the inaccurate or irrelevant information shall be stricken accordingly *before the report is transmitted to the department of corrections.* [Emphasis added.]

This Court has ruled that when a trial court "fail[s] to adequately resolve [a defendant]'s challenges" to a PSIR, remand is appropriate "for proper consideration of his challenges." *Maben*, 313 Mich App at 555. During defendant's sentencing hearing, defense counsel objected to the facts set forth in the "Agent Description of the Offense" that were derived entirely from the police report because many of those facts were inconsistent with the jury's verdict of acquittal on three counts. Counsel proposed adding the following language to the agent's description: "Defendant denies physically assaulting the victim and specifically denies strangling or sexually assaulting the victim, and the jury verdict supports the Defendant's position." The trial court agreed to include the reference to defendant's denials, but it declined to include a reference to the acquittals. Although we agree with the trial court that defense counsel's proposed language may have overstated what the jury determined, we conclude that the jury's verdict of acquittal on three of the four counts, including the charge of strangulation, must be stated in the agent's description. We reach this conclusion because, absent recognition that defendant was acquitted of crimes based on conduct recited in the PSIR, the agent's description would constitute inaccurate information.[2] Therefore, we remand the case for the limited purpose of modifying the PSIR to ensure that the agent's description clearly reflects defendant's acquittal on three of the four charges that flowed from the police report.

Conviction and sentence affirmed, but remanded for the limited purpose of modifying the "Agent Description of the Offense" in defendant's PSIR. We do not retain jurisdiction.

/s/ Sima G. Patel
/s/ Christopher P. Yates
/s/ Douglas B. Shapiro

---

[2] The agent's description does state at the outset that the "[i]nformation below is taken from police and laboratory reports. Information provided at trial may differ slightly or be in addition to this narrative." While accurate, this statement alone is not sufficient in the context of an acquittal.