*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A V-B H.

---

KELLY NEWLAND,

        Petitioner-Appellant,

v

A V-B H,

        Respondent-Appellant.

UNPUBLISHED
April 21, 2026
9:43 AM

No. 367980
Kent Probate Court
LC No. 24-932338-MI

---

Before: O'BRIEN, P.J., and FEENEY and WALLACE, JJ.

PER CURIAM.

Respondent appeals as of right the probate court's initial order for mental-health treatment. We affirm.

## I. FACTS

In April 2024, respondent's mother petitioned the probate court to order respondent to undergo mental-health treatment because respondent was not attending to her activities of daily living. Respondent also believed that her father was "being raped while in jail," the police were "trying to kill her," and that her technology was "bugged." The petition also alleged that respondent stated that "she will kill herself . . . ." Shortly after this petition was filed, a psychiatrist and a physician examined respondent. The physician reported that respondent was "having delusions about the Michigan Probation System" and stating that "her primary care doctor [was] telling her to flee the country." The psychiatrist reported that respondent believed that a powerful person in the government was trying to kill her or put her in prison "due to her ability to expose the corruption in the prison system" and that respondent "left the country because she was worried there were warrants against her." The psychiatrist diagnosed respondent with "[s]evere bipolar 1 disorder, manic, with psychotic features." A hearing on this petition was scheduled; however, the petition was voluntarily dismissed because respondent agreed to voluntary treatment.

Between April 2024 and the present case, respondent's mother filed another petition; however, that petition was dismissed because no supplemental clinical certificates had been filed.

-1-

Most recently, on July 23, 2025, respondent was hospitalized, and an emergency room nurse petitioned the probate court to order respondent to undergo mental-health treatment because respondent had claimed that the President raped her, that she had been "drugged [and] trafficked," and that she had ticks in her mouth.

Two clinical certificates were filed with this petition. Psychiatrist Carmen Dozeman signed one certificate. Dr. Dozeman examined respondent and diagnosed her with "[b]ipolar 1 disorder, manic, severe with psychosis." Dr. Dozeman further stated that respondent had "several bizarre delusions," including believing that she was pregnant despite several negative tests and believing that she was being threatened by someone rich and powerful. Dr. Dozeman also explained that respondent was "tangential with pressured speech . . . ." Dr. Dozeman concluded that respondent required involuntary mental-health treatment, including hospitalization pending the hearing, because she did not understand the need for treatment and was unwilling to undergo the necessary treatment.

The other clinical certificate was signed by a nurse practitioner and Dr. David Piscitelli, a physician; however, a few days before the hearing, respondent's counsel notified the probate court that, according to respondent, Dr. Piscitelli did not actually evaluate her. After the probate court attempted to contact Dr. Piscitelli to no avail, it dismissed the petition on July 28, 2025. In this dismissal order, the probate court also ordered the petitioner to file a new petition. Respondent remained hospitalized.

On July 30, 2025, the petitioner filed a new petition along with two new clinical certificates. The petition stated that respondent presented "manic with psychotic features including paranoi[a], persecutory and somatic delusions." It alleged that respondent reported that there was a tick in her gums, that she was pregnant (despite negative tests), and that people were breaking into her house and "now she refuses to live there." Further, it noted that respondent had been hospitalized the year before for "similar impulsive decision making based on her delusions."

Psychiatrist James Eicher signed the first clinical certificate. Dr. Eicher diagnosed respondent with "[b]ipolar 1 disorder manic severe with psychosis." Further, Dr. Eicher alleged that respondent could reasonably be expected to seriously physically injury herself or others because respondent "required PRN medications[1] in emergency department [ED] due to agitation, eloped from ED as well, inadvertent risk to self given influence of delusions on behaviors and judgment." Dr. Eicher also noted that respondent refused to comply with treatment and claimed "to have been raped by the president and sex trafficked 'for years.' " Respondent also claimed to have "constant seizures," a "foreign body in sinus," an "ectopic pregnancy," and a "tick in gums" despite negative pregnancy tests and negative CT scans of her head and abdomen. Dr. Eicher recommended a combination of hospitalization and assisted outpatient treatment to treat respondent and that respondent be hospitalized pending the hearing.

---

[1] "PRN medications" in this context appears to mean "medications, treatments, or interventions that do not need to be administered on a regular schedule but rather only when necessary." Nurse.com, Uses of PRN in Medical Care <https://www.nurse.com/nursing-resources/how-to-guides/prn-in-medical-care/> (accessed March 17, 2026).

Psychiatrist Valerie Mathis-Allen signed the second clinical certificate. Dr. Mathis-Allen diagnosed respondent with "[s]evere manic bipolar 1 disorder with psychotic features." Dr. Mathis-Allen noted that, as a result of respondent's disorder, respondent: (1) was reasonably expected to "seriously physically injure [her]self or others"; (2) could not attend to her "basic physical needs"; and (3) lacked the "understanding of the need for treatment," was unwilling to participate in the necessary treatment, and presented "a substantial risk of significant physical or mental harm" to herself or others. In support of these assertions, Dr. Mathis-Allen provided, in significant detail, various statements and actions that she observed while treating respondent. For example, Dr. Mathis-Allen explained that respondent refused most interactions with hospital staff and would instead write on several sticky notes and place them on her door. Dr. Mathis-Allen also explained that respondent presented "manic with psychotic features, rapid pressured speech, flight of idea, irritability, mood lability, lacks insight, poor judgment, increased motor activity, talkative." Dr. Mathis-Allen also recommended a combination of hospitalization and assisted outpatient treatment and that respondent be hospitalized pending the hearing.

On August 5, 2025, the probate court held a hearing on the July 30 petition, at which both Dr. Dozeman and respondent testified. Dr. Dozeman testified that she was a psychiatrist at the hospital where respondent was being treated.[2] Dr. Dozeman testified that she met with respondent and diagnosed her with "Bipolar I disorder." In support of this diagnosis Dr. Dozeman detailed respondent's mental-health history and her "odd delusions." Specifically, Dr. Dozeman explained that respondent was previously admitted to the same hospital in April 2024, and that respondent was exhibiting similar symptoms during her hospitalization leading up to the present hearing. Specifically, respondent had elevated mood, increased energy, distractibility, and hyperverbal speech.

In addition, regarding respondent's delusions, Dr. Dozeman testified that respondent stated that "a federal judge had ordered her father to be deliberately infected with HIV" and reported that "she felt the police were going to kill her, and she might kill herself before that could happen." Dr. Dozeman also testified that respondent had "made many somatic complaints" during her hospital stay leading up to the hearing. Specifically, respondent stated that she believed that she had a "tick embedded in her gums," that "she was pregnant despite negative tests," and that a "rich and powerful man" threatened her life. Dr. Dozeman also testified that respondent told a staff member at the hospital that she believed that "Donald Trump, Elon Musk, and the Vatican had come to her door and that her family [was] being threatened."

Dr. Dozeman recommended continued hospitalization and testified that she thought that respondent could be an inadvertent danger to herself "if her delusions get bad enough," noting that "they could affect her behavior and her judgment."

Respondent's counsel then called respondent to the stand. Respondent testified that she disagreed with Dr. Dozeman's diagnosis and that she did not believe that she suffered from any mental-health disorders. Respondent explained that her dental hygienist told her that she had a tick in her gums, and her primary care doctor told her that she needed an oral surgeon because it

_____

[2] Both parties stipulated that Dr. Dozeman was qualified to testify as an expert witness in the field of psychiatry.

was already embedded. Respondent further explained that her gynecologist told her that she had an ectopic pregnancy, but she no longer believed that she was pregnant because she "probably . . . already miscarried it." Respondent denied ever stating that the president raped her; that Elon Musk threatened her life; or that Elon Musk, Donald Trump, or the Vatican came to her door. She further explained that she believed that these allegations came from a Facebook post that was taken out of context. The probate court asked respondent about an allegation in the April 2024 petition, stating that respondent had fled the state or country because she was afraid of being killed. Respondent explained that she simply "took a vacation" to see the "total solar eclipse."

Following respondent's testimony, the probate court found by clear and convincing evidence that respondent required treatment under MCL 330.1401(1)(a) and (c). It further found by clear and convincing evidence that respondent suffered from a mental illness, specifically "Bipolar I disorder, current episode manic and severe . . . ." It also found that respondent presented "an inadvertent risk of harm to self, given her paranoia, manic behavior, delusions, and tangential thought" and that respondent's unwillingness to voluntarily participate in necessary treatment also presented a "substantial risk of significant physical or mental health harm to self." The probate court also noted that it thought that much of respondent's testimony was "unfortunately, untrue or delusional in nature . . . ." The probate court then committed respondent to combined hospitalization and assisted outpatient treatment for no more than 180 days, with the first 60 days in the hospital. Respondent now appeals.

## II. MENTAL-HEALTH ORDER

On appeal, respondent argues that the probate court's order should be reversed because: (1) the probate court failed to strictly comply with the Mental Health Code, (2) there was insufficient evidence to demonstrate that respondent was a person requiring treatment, and (3) respondent received ineffective assistance of counsel. We disagree.

### A. COMPLIANCE WITH MENTAL HEALTH CODE

Respondent first argues that the probate court plainly erred because it did not strictly comply with the Mental Health Code, MCL 330.1001 *et seq*. We agree that the probate court did not strictly comply with the Mental Health Code; however, we conclude that the probate court's order does not need to be reversed.

### 1. PRESERVATION AND STANDARD OF REVIEW

Because respondent failed to raise this issue in the lower court, it is not preserved for appellate review. See *In re Jestila*, 345 Mich App 353, 355 n 3; 5 NW3d 362 (2023). We review unpreserved issues in civil-commitment cases for plain error affecting a respondent's substantial rights. See *In re MAT*, ___Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 369255); slip op at 2-3. Under the plain-error standard, "a party must show that an error occurred, that it was clear or obvious, and that it caused prejudice, i.e., that the error affected the outcome of the proceedings." *Id*. at ___; slip op at 3 (quotation marks and citation omitted). We review de novo matters of statutory interpretation, *In re Tchakarova*, 328 Mich App 172, 182; 936 NW2d 863 (2019), and questions of law such as whether a person has been afforded due process, *In re Jestila*, 345 Mich App at 355 n 3.

2. ANALYSIS

The Mental Health Code provides the statutory framework for imposing involuntary mental-health treatment on an individual. See MCL 330.1403; see also *In re Portus*, 325 Mich App 374, 382; 926 NW2d 33 (2018). A proceeding imposing involuntary mental-health treatment is generally referred to as a civil-commitment proceeding. *In re Portus*, 325 Mich at 382. "[C]ivil commitment proceedings in Michigan implicate important liberty interests, protected by due process, that belong to the person who is the subject of a petition for involuntary mental health treatment." *In re Londowski*, 340 Mich App 495, 508; 986 NW2d 659 (2022). The procedures under the Mental Health Code "satisfy due process guarantees"; therefore, "civil-commitment statutes must be strictly complied with." *In re Jestila*, 345 Mich App at 356, 358.

An involuntary mental-health proceeding may be initiated by medical certification, MCL 330.1423, or by petition, MCL 330.1434. In this case, the proceeding was initiated by petition. MCL 330.1434 provides, in relevant part, as follows:

> (3) Except as provided in subsection (7),[3] the petition shall be accompanied by the clinical certificate of a physician or a licensed psychologist, unless after reasonable effort the petitioner could not secure an examination. If a clinical certificate does not accompany the petition, the petitioner shall set forth the reasons an examination could not be secured within the petition. The petition may also be accompanied by a second clinical certificate. If 2 clinical certificates accompany the petition, at least 1 clinical certificate must have been executed by a psychiatrist.

> (4) Except as otherwise provided in subsection (7) and section 455, a clinical certificate that accompanies a petition must have been executed within 72 hours before the filing of the petition, and after personal examination of the individual.

When an individual is hospitalized pursuant to a petition, the individual may not be hospitalized for "more than 24 hours," and during those 24 hours, "the individual must be examined by a physician or a licensed psychologist unless a clinical certificate has already been presented to the hospital." MCL 330.1429(1). "If the examining physician or psychologist does not certify that the individual is a person requiring treatment, the individual shall be released immediately." MCL 330.1429(1). But if the examining physician or psychologist executes a clinical certificate stating that the individual is a person requiring treatment, then the individual's hospitalization may continue while the hearing is pending. MCL 330.1429(1); MCL 330.1430. After the probate court receives a petition and accompanying certificates, it must hold a hearing within seven days to determine whether the individual is a "person requiring treatment." MCL 330.1452(1)(a).

---

[3] Subsection 7 does not apply to this case because it discusses petitions that do not seek hospitalization. See MCL 330.1434(7).

In this case, respondent first argues that the probate court did not strictly comply with the Mental Health Code because she was improperly detained, i.e., not discharged, after the first July 2025 petition was filed.

Respondent was hospitalized on July 23, 2025, and a petition seeking mental-health treatment for respondent was filed on July 24, 2025. A hearing was scheduled for this petition; however, days before the scheduled hearing, on July 28, 2025, the petition was dismissed because the probate court determined that one of the accompanying clinical certificates did not comply with the Mental Health Code. Respondent remained hospitalized. Then, on July 30, 2025, a new petition, which complied with the Mental Health Code, was filed, and a hearing was scheduled. It is the July 30, 2025 petition that underlies the order on appeal.

As an initial matter, respondent was not improperly detained between July 23, 2025 and July 28, 2025 or between July 30, 2025 and August 5, 2025 because the Mental Health Code allows a respondent to be hospitalized pending a hearing. See MCL 330.1430. Contrary to respondent's argument, the July 24, 2025 petition was not automatically defective because it was signed by a physician as required by the statute, see MCL 330.1434(3), and the probate court had no reason to believe that Dr. Piscitelli did not examine respondent. Accordingly, it was not until the probate court was notified, and was unable to confirm that Dr. Piscitelli did not meet with respondent, that there was a reason to dismiss the petition. Therefore, respondent was properly hospitalized until the probate court dismissed the July 24, 2025 petition.[4]

Nonetheless, we agree that respondent was improperly hospitalized for the time between July 28, 2025 (when the initial petition was dismissed) and July 30, 2025 (when the second petition was filed). When a petition is dismissed, there are no grounds to involuntarily hospitalize an individual; therefore, the individual should be released. See MCL 330.1472a(1). Because respondent was not released from the hospital, the probate court did not strictly comply with the Mental Health Code. Further, the error was clear and obvious because there is no part of the Mental Health Code that gave the probate court authority, in this case, to hospitalize respondent during that time. But because this issue is not preserved, respondent must also demonstrate that the error affected the outcome of the proceedings. See *In re MAT*, ___Mich App at ___; slip op at 3. Respondent has not demonstrated as such.

Respondent apparently argues that because she was unable to access her medical records when she was improperly detained, it affected the outcome of the proceedings because if she had access to her medical records, then she could have more actively participated in her defense. Respondent provides no support for this assertion, however. Specifically, she provides no indication of what medical records she needed access to or how those records could have helped in her defense. It is just as likely that those medical records could have been detrimental to her

---

[4] Respondent briefly states that that she was deprived of her right to a timely hearing because she was hospitalized on July 23, 2025, and her hearing was not held until August 5, 2025. But as previously stated, the petition at issue was filed on July 30, 2025, and the hearing was held six days later, on August 5, 2025, within the seven days mandated by the statute. See MCL 330.1452(1)(a).

defense. Accordingly, respondent has failed to demonstrate that the probate court's error affected the outcome of the proceeding.

We recognize that respondent was improperly deprived of her liberty for approximately 24 hours; however, respondent's brief improper detainment was arguably reasonable considering "the individual's interest in not being subject to involuntary mental health treatment against the state's interest in compelling mental health treatment for a particular individual." *In re Londowski*, 340 Mich App at 509. Respondent was improperly detained for approximately 24 hours, but the clinical certificates and petitions filed before and after that detainment all supported the state's interest in compelling mental-health treatment for respondent. Accordingly, considering the brief, improper hospitalization in light of significant evidence demonstrating that hospitalization was necessary, respondent's improper detainment was reasonable. Therefore, the probate court's failure to strictly comply with the requirements of the Mental Health Code in this case does not warrant relief.

Respondent also argues that the probate court did not strictly comply with the Mental Health Code when it improperly ordered the petitioner to file a new petition. We agree. The Mental Health Code clearly states how an involuntary mental-health proceeding may be initiated, and by order of a probate court is not one of the methods. Nonetheless, this error also did not affect the outcome of the proceedings. Respondent fails to provide any evidence or support indicating that the probate court's order for a new petition was the only motivating factor behind the filing of the new petition. It is highly likely that a new petition would have been filed voluntarily when the other petition was dismissed because the previous petition and accompanying clinical certificate clearly indicated that respondent likely qualified as a person requiring treatment under the Mental Health Code. And again, respondent provides absolutely no evidence indicating otherwise. Accordingly, respondent has failed to demonstrate that this error affected the outcome of the proceeding. See *In re MAT*, ___ Mich App at ___; slip op at 3.

In sum, although the probate court did not strictly comply with the Mental Health Code in this case, respondent has failed to demonstrate how she was prejudiced by this noncompliance, i.e., that it affected the outcome of the proceeding. Therefore, relief is not warranted.

## B. PERSON REQUIRING TREATMENT

Respondent further argues that there was insufficient evidence to support the probate court's finding that respondent was a "person requiring treatment" under MCL 330.1401(1)(a) and (c). We disagree.

## 1. PRESERVATION AND STANDARD OF REVIEW

Because the probate court addressed and decided whether respondent qualified as a "person requiring treatment" under the Mental Health Code, this issue is preserved for appellate review. See *In re Jestila*, 345 Mich App at 355 n 3. We review a probate court's dispositional rulings for abuse of discretion. *In re MAT*, ___ Mich App at ___; slip op at 2. "An abuse of discretion occurs when the probate court chooses an outcome outside the range of reasonable and principled outcomes." *In re Portus*, 325 Mich App at 381 (quotation marks and citation omitted). When a probate court makes an error of law, it necessarily abuses its discretion. *Id*. We review the factual

findings underlying a probate court's decision for clear error. *Id*. "A probate court's finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*. (quotation marks and citation omitted). "We review de novo matters of statutory interpretation." *Id*.

## 2. ANALYSIS

The term "person requiring treatment" is defined in MCL 330.1401(1). A court must make the determination under at least one of the three subsections of MCL 330.1401(1). In this case, the probate court determined that respondent was a "person requiring treatment" pursuant to MCL 330.1401(1)(a) and (c), which provide as follows:

> (a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.
>
> \* \* \*
>
> (c) An individual who has mental illness, whose judgment is so impaired by that mental illness, and whose lack of understanding of the need for treatment has caused him or her to demonstrate an unwillingness to voluntarily participate in or adhere to treatment that is necessary, on the basis of competent clinical opinion, to prevent a relapse or harmful deterioration of his or her condition, and presents a substantial risk of significant physical or mental harm to the individual or others.

The Mental Health Code defines "mental illness" as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 330.1400(g).[5]

In general, a probate court may properly order a respondent to undergo involuntary mental-health treatment when it finds by clear and convincing evidence that the respondent was a "person requiring treatment" under the MCL 330.1401. *In re Londowski*, 340 Mich App at 504-505. "Evidence is clear and convincing when it produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re MAT*, ___ Mich App at ___; slip op at 6 (quotation marks and citation omitted).

In this case, respondent contends that there was not clear and convincing evidence to support the probate court's finding that respondent presented a risk of seriously injuring herself or

---

[5] In this case, respondent was diagnosed with Bipolar 1 disorder. This Court has previously recognized "schizoaffective disorder, bipolar type" as a substantial disorder of thought and mood. See *In re Tchakarova*, 328 Mich App at 176.

others, MCL 330.1401(1)(a), or that respondent presented a significant risk of substantial harm to herself or others, MCL 330.1401(1)(c). We disagree.

The probate court specifically noted that respondent's "paranoia, manic behavior, delusions, and tangential thought" made her an inadvertent danger to herself. Dr. Dozeman's testimony—that respondent could be an "inadvertent" danger to herself "if her delusions get bad enough"—directly supported this finding. Moreover, respondent's behavior supported the probate court's finding that respondent posed an inadvertent danger to herself. Specifically, the record indicates that respondent: (1) required medication in the emergency department because of agitation; (2) eloped from the emergency department instead of receiving treatment; (3) had previously left the state, or country, to camp in the woods because of her delusions; and (4) had "made statements that she felt the police were going to kill her, and she might kill herself before that could happen." These facts indicate that respondent's disorder posed a significant risk of influencing her judgment and therefore likely placing respondent in danger. Accordingly, the probate court did not clearly err when it determined that respondent qualified as a person requiring treatment under both MCL 330.1401(1)(a) and (c).

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, respondent argues that her counsel was ineffective. We disagree.

### 1. PRESERVATION AND STANDARD OF REVIEW

Because defendant did not raise this issue in a motion for a new trial or evidentiary hearing filed in the trial court, or in a motion to remand for an evidentiary hearing filed in this Court, it is not preserved for appellate review. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020); *People v Sabin (On Second Remand)*, 242 Mich App 656, 658; 620 NW2d 19 (2000). When a claim of ineffective assistance of counsel is not preserved, "our review is limited to errors apparent on the record." *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008).

### 2. ANALYSIS

"[A]n individual subject to a petition in a civil commitment proceeding has a right to the effective assistance of counsel." *In re Londowski*, 340 Mich App at 515. When challenging counsel's effectiveness,

[f]irst, the respondent must show that counsel's performance was deficient under an objective standard of reasonableness. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by due process. Second, the respondent must show prejudice by demonstrating that counsel's errors were so serious as to deprive the respondent of a fair hearing . . . whose result is reliable. [*Id.* (quotation marks and citations omitted).]

"Effective assistance of counsel is presumed and the defendant bears a heavy burden of proving otherwise." *People v Lockett*, 295 Mich App 165, 187; 814 NW 2d 295 (2012).

Decisions regarding whether to call or question a witness are presumed to be matters of trial strategy. . . . Likewise, decisions regarding what evidence to

-9-

present, what evidence to highlight during closing argument, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy. This Court will not second-guess counsel on matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. [*People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015) (quotation marks and citations omitted).]

But "a court cannot insulate the review of counsel's performance by calling it trial strategy." *In re Londowski*, 340 Mich App at 517 (quotation marks and citation omitted). Instead, "a court must determine whether the strategic choices were made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 517-518 (quotation marks and citation omitted).

In this case, respondent provides a lengthy list of reasons why her counsel was ineffective. First, respondent asserts that her counsel was ineffective because she failed to inform respondent of the nature of the hearing on the petition. In support of this assertion, respondent alleges that she had "limited communication" with her counsel before the hearing. Respondent provides no other information. Further, the record indicates that respondent had notice that this hearing would involve the petition requesting that the probate court order involuntary mental-health treatment. Respondent provides no evidence other than her declaration to indicate that her counsel misinformed or failed to inform her of the nature of this hearing. The hearing transcript also does not provide any indication that respondent was confused about the nature of the hearing. Therefore, this bare assertion, unsupported by the record, fails to meet the heavy burden of proving that respondent's counsel was ineffective.

Respondent also argues that her counsel was ineffective because she failed to request a jury trial. But respondent produces no evidence, or indication on the record, that she wanted a jury trial. The first—and only—time respondent ever expressed her desire for a jury trial was on this appeal. Respondent's counsel had no reason to request a jury trial if respondent did not communicate her desire for a jury trial. Accordingly, this assertion also fails to meet the heavy burden of proving that respondent's counsel was ineffective.

Respondent further argues that her counsel was ineffective because she ineffectively cross-examined the witness. In support of this assertion, respondent states that her counsel "only had seven questions for the doctor" and none of the questions were regarding respondent's diagnosis or whether she presented a risk of harm. As discussed earlier, decisions regarding how to question witnesses are presumed to be matters of trial strategy. *Putman*, 309 Mich App at 248. Respondent provides no evidence or indication that this was not a strategic choice, and a review of the record does not indicate otherwise. Specifically, Dr. Dozeman, Dr. Mathis-Allen, and Dr. Eicher all agreed on respondent's diagnosis and provided significant evidence in support of their diagnosis, and as discussed earlier, the record contains significant evidence supporting the determination that respondent presented a risk of harm. Accordingly, it is likely that if respondent's counsel further questioned Dr. Dozeman about respondent's diagnosis, then Dr. Dozeman would have testified about even more evidence that did not favor respondent's position. Therefore, we presume that respondent's counsel's cross-examination of Dr. Dozeman was a matter of trial strategy and not objectively deficient. See *id*.

Respondent next argues that her counsel was ineffective because she failed to investigate or present evidence on respondent's behalf. In support of this assertion, respondent states, "I had gathered statements from people at [the hospital] indicating that I was not a risk of harm to myself or anyone." But neither respondent nor the record provides any indication that respondent ever informed her counsel that she gathered these statements. Further, even if respondent's counsel was deficient for failing to present these gathered statements, respondent has still failed to demonstrate that this deficiency was prejudicial. There was significant evidence in the record and testimony at the hearing supporting the probate court's determination that respondent posed a risk of harming herself. Respondent provides no detail about these gathered statements that would indicate how they would be more credible than the statements relied on by the probate court. Accordingly, this assertion also fails to meet the heavy burden of proving that respondent's counsel was ineffective.

Respondent lastly argues that her counsel was ineffective because she called respondent to testify even though respondent did not want to testify. In support of this argument, respondent lists several reasons about why she did not want to testify. Respondent further states that her counsel never asked her if she wanted to testify and that her counsel did not prepare her to testify. This argument is not persuasive because there is no indication in the record that respondent did not want to testify. When respondent was called to testify by her counsel, at no point whatsoever did she ever indicate that she did not want to testify. In fact, the transcript does not reveal any hesitation on respondent's part before or during her testimony. In sum, if respondent did not want to testify, she could have communicated as such, and counsel was not deficient simply because respondent's testimony was ultimately unfavorable to her defense. See *id.* Accordingly, this assertion also fails to meet the heavy burden of proving that respondent's counsel was ineffective.

In sum, although respondent advances numerous arguments that her counsel was ineffective, many of her arguments did not prove that her counsel was deficient. And to the extent, that her counsel may have been deficient, respondent failed to prove that her counsel's deficient performance prejudiced her. Accordingly, respondent was not denied the effective assistance of counsel.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney
/s/ Randy J. Wallace

.